UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X
                              :

In re: LEHMAN BROTHERS INC.,    :

                       Debtor. :

------------------------------------ X
                              :

BARCLAYS CAPITAL INC. and BARCLAYS  :
BANK PLC,                     :     11 Civ. 6052 (KBF)
                              :     11 Civ. 6053 (KBF)
     Appellant and Cross-Appellees,  :
                              :        AMENDED
        -v-                 :    OPINION & ORDER*
                              :

JAMES W. GIDDENS, as TRUSTEE for the  :
SIPA LIQUIDATION of LEHMAN BROTHERS  :
INC.,                          :
                              :
     Appellee and Cross-Appellant.  :
------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: JUL 16 2012

KATHERINE B. FORREST, District Judge:

     The cross-appeals from the February 22, 2011 decision (the
"Decision") of the Honorable James M. Peck, Bankruptcy Judge,
arise out of what is commonly referred to as the "fog of
Lehman"--the week of September 15 through September 22, 2008,
which culminated in Barclays Capital Inc. ("Barclays")
purchasing out of bankruptcy most of the North American business
assets (the "Sale") of Lehman Brothers Inc. ("LBI").  Out of
that fog emerged not only a changed economic worldview, but also
the disputes that are the subject of the instant cross-appeals.

---

*This Amended Opinion & Order is being issued pursuant to the Second
Circuit's Order permitting limited remand pursuant to Fed. R. App. P. 12.1,
dated July 16, 2012.  The Court will also issue a consented-to judgment
pursuant to that Order.

The cross-appeals center upon the Bankruptcy Court's rulings with respect to which entity owns each of three categories of assets (the "Disputed Assets").[1] Barclays appeals the Bankruptcy Court's Decision that (a) Barclays is not entitled to the "property that may be held to secure obligations under" the exchange-traded derivatives transferred to Barclays in the Sale--approximately $4 billion of proprietary margin held at various financial institutions (the "Margin Assets")--and thus (i) must return those assets to the extent that they have been previously delivered (and must pay $280 million in prejudgment interest) and (ii) is not entitled to receive the undelivered Margin Assets; and (b) Barclays is not entitled to "$769 million of securities, as held by or on behalf of LBI on the date hereof pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934, as amended, or securities of substantially the same nature and value." (Opening Br. of Appellants Barclays Capital Inc. & Barclays Bank PLC, 11 Civ. 6052 (Dkt. No. 16) ("Barclays Br.") at 5-6.)

James W. Giddens, as trustee for the Securities Investor Protection Act ("SIPA") liquidation of LBI (the "Trustee"), cross-appeals, seeking reversal of the Bankruptcy Court's

---

[1] The Disputed Assets were "identified or discovered on the morning" of September 19, 2008--prior to the hearing before the Bankruptcy Court for approval of the Sale--"in the course of a final search by Barclays for additional assets (the so-called 'asset scramble')." In re Lehman Bros. Holdings Inc., 445 B.R. 143, 151 (Bankr. S.D.N.Y. 2011).

Decision that Barclays is entitled to assets that LBI maintained in its clearance boxes (a type of custodial clearing account) at the Depository Trust & Clearing Corporation ("DTCC") (the "Clearance Box Assets"). (Br. for Cross-Appellant James W. Giddens, As Trustee for the SIPA Liquidation of Lehman Brothers Inc., 11 Civ. 6053 (Dkt. No. 14) ("Trustee Br.") at 5-6.)

For the reasons that follow, the Decision of the Bankruptcy Court is AFFIRMED IN PART and REVERSED IN PART.

I.   BACKGROUND

The facts relating to Lehman's bankruptcy and subsequent sale to Barclays are dramatic and complex. Events relating to the Sale have become part of what is known as the "fog of Lehman." To resolve the issues on the instant cross-appeals, this Court's job is to ensure that the Decision (made in the wake of that fog) properly interpreted the agreements memorializing the Sale.

Accordingly, the background recited herein does not examine the events leading up to one of the most memorable financial transactions in modern economic history. Instead, it hews closely to the agreements at issue and delves further only where strictly necessary.

---

*This Amended Opinion & Order is being issued pursuant to the Second Circuit's Order permitting limited remand pursuant to Fed. R. App. P. 12.1, dated July 16, 2012. The Court will also issue a consented-to judgment pursuant to that Order.

There are three agreements integral to resolution of the instant cross-appeals:  the Asset Purchase Agreement ("APA"), an agreement referred to as the "Clarification Letter," and an agreement referred to as the "DTCC Letter."  The other document critical to resolving the cross-appeals is the Bankruptcy Court's order approving the Sale (the "Sale Order").  It is important to note that in the relevant agreements, the articulation of the assets purchased in and excluded from the Sale evolves.  The Court sets forth that chronological progression below.

A.    Facts Relating to the Sale

On September 15, 2008, Lehman Brothers Holdings, Inc. ("LBHI" and with LBI, "Lehman"), LBI's parent, filed for bankruptcy.  In re Lehman Bros. Holdings Inc., 445 B.R. 143, 155 (Bankr. S.D.N.Y. 2011) ("In re Lehman").  That filing precipitated the SIPA liquidation of LBI, Lehman's North American broker-deal, on September 19, 2008.  Id. at 172. Immediately after LBHI filed for bankruptcy, representatives from both Lehman and Barclays met to discuss the possibility of the sale of Lehman's North American business to Barclays. Ultimately, Barclays agreed to the purchase, giving rise to "the largest, most expedited and probably the most dramatic asset

sale that has ever occurred in bankruptcy history."[2] Id. at
148-49, 155.  Barclays and Lehman executed the APA for the Sale
on September 16, 2008.  [See R. 1-47.][3]  With, as the Bankruptcy
Court called it, "the proverbial 'ice cube' . . . melting," the
APA "represented the best possible alternative for Lehman's
employees.  ...  Indeed, it was the only alternative."  In re
Lehman, 445 B.R. at 153.

On September 17, 2008, the parties requested that the
Bankruptcy Court approve the Sale.  In re Lehman, 445 B.R. at
174.  [See also R. 377.]  On September 19, 2008, the Bankruptcy
Court held a hearing to do so (the "Sale Hearing"), in which the
APA was central.  In re Lehman, 445 B.R. at 150.  In addition to
presenting the APA, however, the parties also informed the
Bankruptcy Court that they were preparing a "clarification
letter" that had yet to be "finalize[d]," but which reflected
"[s]ome other changes" that were made that "affect what are
called purchase [sic] assets and what are excluded assets" (the
"Clarification Letter").  [R. 1591.]  LBI's SIPA Trustee and
counsel for the Securities Investor Protection Corporation

---

[2] Barclays and Lehman had engaged in prepetition negotiations about the
possibility of Barclays' purchasing Lehman's global business in its entirety.
In re Lehman, 445 B.R. at 155.  The Bankruptcy Court found that those
negotiations, while ultimately unsuccessful, "served as a prelude to and
essential preparation for a high-speed emergency acquisition . . . ."  Id.

[3] Citations to "R. ___" refer to the record submitted in these cross-appeals.

*This Amended Opinion & Order is being issued pursuant to the Second
Circuit's Order permitting limited remand pursuant to Fed. R. App. P. 12.1,
dated July 16, 2012.  The Court will also issue a consented-to judgment
pursuant to that Order.

("SIPC") attended the Sale Hearing and supported the Sale without reservation. [R. 1595, 1597.]

In approving the Sale that same day (via the Sale Order), the Bankruptcy Court found that the Sale "was the means both to avoid a potentially disastrous piecemeal liquidation and to save thousands of jobs in the troubled financial services industry." In re Lehman, 445 B.R. at 153. [See also R. 377-400.] By its terms, the Sale Order approved not only the APA (as amended), but also prospectively approved "that letter agreement clarifying and supplementing the [APA] dated September 20, 2008 (as same may be subsequently modified or amended or clarified, the 'Purchase Agreement')." [R. 377; see also R. 388.] The Sale Order further "authorized and directed" the parties to "take all other and further actions as may be reasonably necessary to implement the transactions contemplated by the Purchase Agreement." [R. 388.] It also explicitly recognized Barclays' representation that it would not have agreed to the Sale if it "was not free and clear of all Interests of any kind or nature whatsoever, or if [Barclays] would, or in the future could, be liable for any of the Interests." [R. 384.][4]

---

[4] The Sale Order defines "Interests" as "all Liens, claims (as defined in section 101(5) of the Bankruptcy Code) (including, without limitation, successor liability claims), encumbrances, obligations, liabilities, contractual commitments, rights of first refusal or interests of any kind or nature whatsoever . . . ." [R. 383.]

During the weekend subsequent to the Sale Hearing (the "pre-closing weekend"), the parties worked to, among other things, finalize the Clarification Letter.  The Clarification Letter, as set forth in detail in Part I.B. infra, revised portions of the definitions of Purchased and Excluded Assets set forth in the APA.  On September 22, 2008, the parties filed the Clarification Letter on the public docket, "giving broad notice of its terms."  In re Lehman, 445 B.R. at 162.

The "transaction formally closed" on the morning of Monday, September 22, 2008.  Id. at 161.

B.   Disputed Assets No. 1:  Facts Relating to the Margin Assets

The Margin Assets at issue on this appeal consist of approximately $4 billion in assets that had been maintained by LBI at various financial institutions "in connection with LBI's [ETD] business."  In re Lehman, 445 B.R. at 195.[5]  [See also R.

---

[5] The Decision identifies the Margin Assets as "$4 billion in cash and cash equivalents held at the OCC, other clearing corporations and exchanges, certain banks, and certain foreign futures brokers in connection with derivatives trading."  In re Lehman, 445 B.R. at 195.  Approximately $2 billion of that was "customer property [held] as margin for futures positions of [LBI's] customers, along with additional customer property held as margin for the options positions of customers."  Id. at 198.  The Bankruptcy Court held that such customer property was captured by the term of the Clarification Letter in dispute on Barclays' appeal regarding the Margin Assets (i.e., "exchange-traded derivatives (and any property that may be held to secure obligations under such derivatives)"), and was "consistent with other provisions of the Clarification Letter that are intended to ensure the transfer of customer property to Barclays," for the benefit of LBI's (now Barclays') customers.  Id. at 199.  Thus, the $2 billion in Margin Assets

*This Amended Opinion & Order is being issued pursuant to the Second Circuit's Order permitting limited remand pursuant to Fed. R. App. P. 12.1, dated July 16, 2012.  The Court will also issue a consented-to judgment pursuant to that Order.

67185.]   The Margin Assets were LBI property, used by LBI to support trading on its own behalf as well as on behalf of its customers.   Id.   To be clear, the Margin Assets held at the Options Clearing Corporation (the "OCC") were only LBI proprietary margin assets, not LBI customer margin.   Tr. at 17:3-17:4, 17:7-17:8.[6]

Under the APA, the "Business" being sold included "the U.S. and Canadian investment banking and capital markets businesses of Seller [Lehman] including the fixed income and equities cash trading, brokerage, dealing, trading and advisory businesses, investment banking operations and LBI's business as a futures commission merchant."   [R. 6.]   The APA contains definitions of both the assets included in the Sale (the "Purchased Assets") and those excluded (the "Excluded Assets").   Excluded Assets are defined as, inter alia, "(b) all cash, cash equivalents, bank deposits or similar cash items of LBI and its Subsidiaries (the 'Retained Cash') other than $1.3 billion in cash, cash equivalents, bank deposits or similar cash items" and "(n) all

---

relating to customer exchange-traded derivatives was transferred to Barclays and the Trustee has never disputed or appealed that transfer.   The amount in dispute on Barclays' appeal before this Court is the full $4 billion of Lehman proprietary margin maintained on Lehman's own behalf at various financial institutions.

[6] "Tr." refers to the transcript of the April 20, 2012 oral argument in this matter.   (Dkt. No. 34.)

assets primarily related to the IMD Business and derivatives contracts."   [R. 6, 8.][7]

> Purchased Assets are defined as, <u>inter alia</u>,
>
> all of the assets of Seller and its Subsidiaries used in connection with the Business (excluding the Excluded Assets), including . . . (a) the Retained Cash; (b) all deposits (including customer deposits . . . and required capital deposits) and prepaid charges and expenses of Seller and its Subsidiaries associated with the Business . . .; . . . (d) government securities, commercial paper, corporate debt, corporate equity, <u>exchange traded derivatives</u> and collateralized short term-agreements with a book value as of the date hereof of approximately $70 billion (collectively, '<u>Long Positions</u>') . . . .

[R. 10 (first emphasis added).][8]

The APA does not define separately "exchange-traded derivatives" as used in clause (d) of Purchased Assets nor does it define "derivatives contracts," referred to in clause (n) of Excluded Assets.

Section 2.2 of the APA provides, "Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Seller (directly and indirectly) shall

---

[7] The APA defines the "IMD Business" as "the investment management business of Seller and its Subsidiaries."   [R. 8.]

[8] The exclusion from the Sale of the "[Retained Cash] other than $1.3 billion in cash, cash equivalents, bank deposits or similar cash items" [R. 6] and the purchase of the "Retained Cash" [R. 10] conflict.  It is clear, however, that the parties intended to purchase the "$1.3 billion in cash, cash equivalents, bank deposits or similar cash items" that was excluded from the Excluded Assets and, in an apparent drafting error, used the incorrect term to do so.

\*This Amended Opinion & Order is being issued pursuant to the Second Circuit's Order permitting limited remand pursuant to Fed. R. App. P. 12.1, dated July 16, 2012.  The Court will also issue a consented-to judgment pursuant to that Order.

retain all right, title and interest to, in and under the
Excluded Assets." [R. 15.]

The Clarification Letter, executed on September 22, 2008,
In re Lehman, 445 B.R. at 198 [see also R. 61-76], revised the
definition of Purchased Assets to include explicitly (and in
pertinent part) "all of the assets of Seller used primarily in
the Business or necessary for the operation of the Business (in
each case, excluding the Excluded Assets)." [R. 61.] The
Clarification Letter further amended the definitions of
Purchased Assets to include "(i) the items set forth in clauses
(b), (c) and (f) through (o) and (q) through (s) of the
definition of 'Purchased Assets' in the [APA]." [R. 61.] In
other words, "Purchased Assets" no longer included, among other
things, the "Retained Cash"[9] or the "Long Positions" as set forth
in the APA. The Clarification Letter also (i) added to that
group of "Purchased Assets," inter alia, "(B) such securities
and other assets held in LBI's 'clearance boxes' as of the time
of the Closing, which at the close of business on September 21,
2008 were as specified on Schedule B previously delivered by
Seller and accepted by Purchaser . . . ." [R. 61]; and (ii) in

---

[9] At the Sale Hearing, the parties represented to the Bankruptcy Court that
the $1.3 billion included in the Sale (that had been reduced to $700 million
over the course of negotiations) was no longer part of the Sale (and thus,
not a Purchased Asset) because LBI had a "virtually nil" "cash balance" due
to liquidation of trades by the Chicago Mercantile Exchange and by "the other
clearing banks involved in the processing of the transactions" during "Lehman
Week" (i.e., the week of September 15 through September 22, 2008, In re
Lehman, 445 B.R. at 153). [See R. 1428, 1592.]

paragraph 1(a)(ii)(C), retained two assets previously defined as part of the Long Positions--"exchange-traded derivatives (and any property that may be held to secure obligations under such derivatives) and collateralized short-term agreements" [R. 62].

The Clarification Letter also amended the definition of Excluded Assets. The items in clauses (b) and (k) of the APA's Excluded Assets were dropped from the revised definition--_i.e._, "(b) . . . the Retained Cash other than $ 1.3 billion in cash, cash equivalents, bank deposits or similar cash items" and "(k) 50% of each position in residential real estate mortgage securities" were no longer Excluded Assets. [_See_ R. 62; R. 28765-66.] With respect to the disposition of cash, the Clarification Letter provides in paragraph 1(c), "Except as otherwise specified in the definition of 'Purchased Assets,' 'Excluded Assets' shall include any cash, cash equivalents, bank deposits or similar cash items of Seller and its Subsidiaries." [R. 62 (emphasis added).] It did not, however, amend the APA's clause (n) of Excluded Assets (referring to the "IMD Business and derivatives contracts"); in paragraph 1(c), however, it added an enumeration of, _inter alia_, specific types of derivatives that constituted Excluded Assets--_i.e._, "[a]ll the investments held by [Lehman] in collateralized debt obligations,

---

*This Amended Opinion & Order is being issued pursuant to the Second Circuit's Order permitting limited remand pursuant to Fed. R. App. P. 12.1, dated July 16, 2012. The Court will also issue a consented-to judgment pursuant to that Order.

collateralized loan obligations, over-the-counter derivatives, TBA mortgage notes and similar asset-backed securities and corporate loans . . . ."  [R. 62.]

C.  Disputed Assets No. 2:  Facts Relating to the 15c3-3 Assets

The regulations governing registered or operating broker-dealers under the Securities Exchange Act of 1934 require that "[e]very broker or dealer shall maintain with a bank or banks at all times when deposits are required or hereinafter specified a 'Special Reserve Account for the Exclusive Benefit of Customers' (hereinafter referred to as the 'Reserve Bank Account'), and it shall be separate from any other bank account of the broker or dealer."  17 C.F.R. § 240.15c3-3(e)(1) (hereinafter "Rule 15c3-3").  The regulation also sets forth a requirement for the amount to be kept in the Reserve Bank Account "at all times," and also only allows withdrawals "if and to the extent that at the time of the withdrawal the amount remaining in the reserve bank account is not less than the amount required by" the regulation.  17 C.F.R. § 240.15c3-3(e)(1), 17 C.F.R. § 240.15c3-3(g).

SIPA itself also promulgated a rule regarding the same types of accounts:  it requires broker-dealers (particularly liquidating broker-dealers such as LBI) to maintain assets

(including securities) sufficient to "satisfy net equity claims of customers . . . ." 15 U.S.C. § 78fff(a)(1)(B).

The 15c3-3 Assets at issue here (to which Barclays claims entitlement and as to which the Trustee maintains its rights) are "(i) $769 million in securities segregated by LBI for its customers in compliance with SIPA and Rule 15c3-3 and (ii) $507 million in assets posted by LBI as margin with the [OCC] and listed as a debit item in LBI's reserve calculation for purposes of Rule 15c3-3." In re Lehman, 445 B.R. at 191.

The Clarification Letter deals with the 15c3-3 Assets as follows:

> All customer accounts of LBI (other than customers who are Affiliates of LBI) shall be transferred to Purchaser [i.e., Barclays]. In connection therewith, Purchaser shall receive (i) for the account of the customer, any and all property of any customer, including any held by or on behalf of LBI to secure the obligations of any customer, whose account(s) are being transferred to Purchaser as part of the Business and (ii) to the extent permitted by applicable law, and as soon as practicable after the Closing, $769 million of securities, as held by or on behalf of LBI on the date hereof pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934, as amended, or securities of substantially the same nature and value.

[R. 64 (emphases added).]

> D.   Disputed Assets No. 3:   Facts Relating to the Clearance Box Assets

---

*This Amended Opinion & Order is being issued pursuant to the Second Circuit's Order permitting limited remand pursuant to Fed. R. App. P. 12.1, dated July 16, 2012. The Court will also issue a consented-to judgment pursuant to that Order.

The Clearance Box Assets--<u>i.e.</u>, "approximately $1.9 billion in unencumbered securities held in LBI's 'clearance box' at the [DTCC]," [10] which the Bankruptcy Court awarded to Barclays and which the Trustee now seeks to have returned--were an additional source of contention (and negotiations) during the pre-closing weekend.  <u>In re Lehman</u>, 445 B.R. at 199.  Those negotiations resulted in two separate agreements dealing with the Clearance Box Assets:  what is known as the "DTCC Letter," as well as a provision in the Clarification Letter.  <u>Id.</u> at 199-200.  The Bankruptcy Court found that the two letters contain "seemingly contradictory provisions."  <u>Id.</u> at 200.

Under the Clarification Letter, Purchased Assets includes (as noted above) "such securities and other assets held in LBI's 'clearance boxes' as of the time of the Closing, which at the close of business on September 21, 2008 were as specified on Schedule B previously delivered by Seller and accepted by Purchaser."  [R. 61.]  As the Bankruptcy Court noted, Schedule B showed the assets to be transferred, 98 percent of which were "in LBI's DTC clearance boxes."  <u>In re Lehman</u>, 445 B.R. at 200.

The DTCC Letter--executed among the DTCC, the Trustee, and Barclays--provides, however, that "Barclays has indicated, and hereby agrees, that all of the accounts of LBI maintained at the

---

[10] The parties now agree that the Trustee shall pay Barclays $1.1 billion in lieu of the undelivered Clearance Box Assets.  [R. 58884.]

Clearing Agencies Subsidiaries . . . constitute 'Excluded Assets' within the meaning of the APA." [R. 44584.]

The Clarification Letter specifically states:

> LBI hereby instructs Purchaser to pay at the Closing $250 million of the Cash Amount to the Depository Trust Clearance Corporation ('DTC') for deposit as collateral against LBI's obligation to DTC (including its affiliated clearing organizations). Such collateral account shall be maintained in accordance with the agreement among LBI, Purchaser and DTC entered into in connection with the Closing [i.e., the DTCC Letter].

[R. 63.] In other words, the Clarification Letter recognizes that the DTCC Letter is an operative agreement.[11]

E. Procedural History and The Bankruptcy Court's Decision

The Disputed Assets came before the Bankruptcy Court on (i) a motion by Barclays to secure delivery of certain undelivered assets and (ii) a motion by the Trustee for relief from the Sale Order regarding the Margin Assets, requesting that those assets be returned to the Trustee. [See R. 67184-85.] See also In re Lehman, 445 B.R. at 148, 150. At the same time as it entertained those motions, the Bankruptcy Court considered motions brought pursuant to Rule 60(b) of the Federal Rules of Civil Procedure for relief from the order approving the Sale to Barclays. In re Lehman, 445 B.R. at 148. In connection with

---

[11] Given the ambiguity between the DTCC and Clarification Letters, further facts are set forth in Part II.D. infra.

*This Amended Opinion & Order is being issued pursuant to the Second Circuit's Order permitting limited remand pursuant to Fed. R. App. P. 12.1, dated July 16, 2012. The Court will also issue a consented-to judgment pursuant to that Order.

both sets of motions, the Bankruptcy Court held a hearing over
thirty-four days (in April through October of 2010) (the "2010
Hearing") and found that it "provided an opportunity to review
in slow motion and from multiple vantage points the
circumstances of an acquisition that had to proceed so very
quickly." Id. at 149.

With respect to the Disputed Assets, the Bankruptcy Court
focused on the facts and circumstances surrounding the
Clarification Letter, noting that although the Clarification
Letter was pre-approved by the Sale Order, it had never been
presented to the Bankruptcy Court for final approval subsequent
to execution. In re Lehman, 445 B.R. at 150. That said, the
Bankruptcy Court also found that the parties had treated the
Clarification Letter as a binding agreement, had filed the
Clarification Letter on the public docket almost immediately
following to its execution (on September 22, 2008), and that the
Trustee even supported its enforceability. Id. at 150, 162,
190. The Bankruptcy Court noted that the fact that the
Clarification Letter was filed on the public docket "gav[e]
broad notice of [the Clarification Letter's] terms." Id. at
162.[12]

---

[12] The Bankruptcy Court's treatment of the Clarification Letter plays a
significant role in the Decision--and this Court discusses it in depth in
Part II.A. infra.

The Bankruptcy Court granted Barclays' motion to recover the Clearance Box Assets, but denied the motion as it related to the Margin Assets and 15c3-3 Assets; and granted the Trustee's motion as it related to the Margin Assets.  In re Lehman, 445 B.R. at 151, 191.  The Court arrived at that conclusion based upon a "nuanced interpretation of the Clarification Letter in light of the record of the Sale Hearing, the language of the document and extrinsic evidence concerning the negotiation and drafting of that language."  Id. at 152, 191 (referring to "[c]lose inspection of the plain text of the Clarification Letter, as well as the extrinsic evidence surrounding its negotiation, execution, and implementation . . .").

With respect to the Decision on the Margin Assets, the Bankruptcy Court referred to extrinsic evidence prior to finding ambiguity in the contractual language of the APA or Clarification Letter.  In other words, the Bankruptcy Court relied upon extrinsic evidence to create ambiguity in the agreement.

By the time of the 2010 Hearing, approximately half of the disputed Margin Assets had long been transferred to Barclays. The Bankruptcy Court's Decision required that the Margin Assets be transferred to the Trustee.  [R. 67185.]  In addition, the

*This Amended Opinion & Order is being issued pursuant to the Second Circuit's Order permitting limited remand pursuant to Fed. R. App. P. 12.1, dated July 16, 2012.  The Court will also issue a consented-to judgment pursuant to that Order.

Bankruptcy Court required Barclays to pay prejudgment interest of five percent to the Trustee--approximately $280 million.  In re Lehman, 445 B.R. at 199, 206.  [See also R. 67185.]

II.  DISCUSSION

The standard of review applicable to matters within core bankruptcy jurisdiction is governed by the Federal Rules of Bankruptcy Procedure.  On appeal, the court "may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings."  Fed. R. Bankr. P. 8013.

"Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous." Id.; see Solow v. Kalikow ("In re Kalikow"), 602 F.3d 82, 91 (2d Cir. 2010) (noting that "[f]indings of fact are reviewed for clear error").

The Bankruptcy Court's legal conclusions, however, are reviewed de novo.  Id.  To that end, the Court reviews de novo the Bankruptcy Court's interpretation of the contracts at issue. See Haber v. St. Paul Guardian Ins. Co., 137 F.3d 691, 695 (2d Cir. 1998) ("Whether contract language is ambiguous is a question of law, which we review de novo.").  The same standard applies to the Bankruptcy Court's interpretation of the statutory and regulatory provisions relating to the 15c3-3 Assets.  See In re Quigley Co., Inc., 676 F.3d 45, 58 (2d Cir.

2012).

A.    The Bankruptcy Court's Treatment of the Clarification Letter

The Clarification Letter and the APA are the key documents to resolving Barclays' appeal on the Margin Assets.  The Bankruptcy Court's treatment of the Clarification Letter is the locus of the Decision's error on the Margin Assets.  That treatment also raises a novel question of law:  if the Bankruptcy Court found that the Clarification Letter materially altered the terms of the original deal, did the Bankruptcy Court have the power under section 363 of the Bankruptcy Code, 11 U.S.C. § 363, to approve retroactively "as if after notice and hearing" the terms of the Clarification Letter?  See In re Lehman, 445 B.R. at 188-89, 190.

Despite the import of that question, this Court ultimately need not resolve it because neither Barclays nor the Trustee appealed the Bankruptcy Court's authority to give such ex post facto approval.  Even though the Trustee never appealed the Bankruptcy Court's treatment of the Clarification Letter (likely because, as the Bankruptcy Court found, the Trustee had repeatedly supported enforcement of the Clarification Letter for a period of approximately two years, including at the 2010 Sale Hearing, see In re Lehman, 445 B.R. at 189-90), all of the

*This Amended Opinion & Order is being issued pursuant to the Second Circuit's Order permitting limited remand pursuant to Fed. R. App. P. 12.1, dated July 16, 2012.  The Court will also issue a consented-to judgment pursuant to that Order.

Trustee's arguments against transferring the Margin Assets are premised upon the following point:  if the Clarification Letter is interpreted to transfer the Margin Assets (which include cash) it necessarily (according to the Trustee) contains a material adverse change to the terms of the deal; therefore, the Bankruptcy Court was without power to approve an agreement containing a material adverse change without actual notice and a hearing and thus it, and this Court, must only construe the Clarification Letter as not transferring Lehman proprietary margin (which included cash).  The Trustee's premise--which implicitly seeks to interpose a belated appeal of the Bankruptcy Court's approval of the Clarification Letter, or to avoid such challenge by contortedly finding ambiguity where none exists--is incorrect.

The Bankruptcy Court was faced with two paths with respect to the Clarification Letter:  (1) it could have found that the letter did not materially alter the deal struck between the parties, and thus, because the Clarification Letter had been pre-approved by the Sale Order [see R. 377], enforced it as to its clear terms; or (2) it could have found that the Clarification Letter did materially alter the terms of the Sale, and then taken appropriate actions under relevant federal bankruptcy law, perhaps including retroactively approving it and enforcing it according to its plain terms.  The Bankruptcy Court

20

did not take either path.  Instead, it took a third path:  the
Bankruptcy Court both unequivocally approved the Clarification
Letter "as if after notice and hearing," deemed it
"enforceable," but then (and here lies the error) decided to
superimpose ambiguity onto the terms of the Letter where none
existed based upon the Bankruptcy Court's <u>own</u> experience
during--and recollection of--the Sale Hearing in order to end up
with only those terms that the Bankruptcy Court believed the
letter should contain.  <u>See</u> <u>In re Lehman</u>, 445 B.R. at 162-63,
189-90, 195-98.  This third path did not comport with, at a
minimum, principles of contract law.  This Court traces that
path below.

First, the Bankruptcy Court found that based upon the fact
that the Clarification Letter was filed on the public docket and
that the "parties have relied on [it] as a binding and
enforceable transaction document," it would "do the same."  <u>In</u>
<u>re Lehman</u>, 445 B.R. at 162.[13]  Quite simply, on that finding
alone, (unless ambiguous) the Clarification Letter should have
been enforced according to its plain terms--which include, as
the Bankruptcy Court explicitly found, "grant[ing] rights to

---

[13] That finding can be read to accept implicitly the lack of ambiguity in the
Clarification Letter:  the Bankruptcy Court fully understood the letter's
terms (and the implications thereof)--it just did not like them.

*This Amended Opinion & Order is being issued pursuant to the Second
Circuit's Order permitting limited remand pursuant to Fed. R. App. P. 12.1,
dated July 16, 2012.  The Court will also issue a consented-to judgment
pursuant to that Order.

Barclays in the Margin Assets--the Lehman cash held by exchanges as margin and clearance of exchange traded derivatives." Id.

The Bankruptcy Court immediately thereafter stated that it would enforce only "[t]hose parts of the Clarification Letter that amplify, clarify or bring the transaction into better alignment with the actual structure of the transaction and agreement of the parties." In re Lehman, 445 B.R. at 162. In other words, in the same breath, the Bankruptcy Court finds the Clarification Letter enforceable on its plain terms, but decides to interpret it as if it contained only those "parts" that the Bankruptcy Court understood to be consistent with its original impression that Lehman cash would not be going to Barclays in the Sale. See id. at 162-63. Once the Bankruptcy Court approved the Clarification Letter, however, it was bound to accept that contract on the terms within its four corners. See Lockheed Martin Corp. v. Retail Holdings, N.V., 639 F.3d 63, 69 (2d Cir. 2011). No principle of law allowed the Bankruptcy Court to approve the letter as an enforceable contract, but then construe it based upon its own personal recollection and understandings about the terms of the deal (rather than upon established principles of contract interpretation). See WWW

Assocs., Inc. v. Giancontieri, 77 N.Y.2d 157, 566 N.E.2d 639, 642 (N.Y. 1990).  To do so was error.[14]

Second, the Bankruptcy Court found that the Clarification letter materially altered the terms of original deal--or that it was inconsistent with what the Bankruptcy Court understood to be the terms of the Sale.  In re Lehman, 445 B.R. at 188; see also id. at 151 ("Some of the[] provisions [of the Clarification Letter] are either radically different from anything presented at the Sale Hearing or in actual conflict with statements made during the hearing.").  The Bankruptcy Court found that because the Clarification Letter "materially modified" the terms of the Sale, "separate approval" of it "should have been requested." Id.[15]  In making that finding, the Bankruptcy Court ignored at least two facts.

Initially, it ignored that the Sale Order explicitly pre-approved the Clarification Letter [see R. 377] and thus, there was no need to ensure that its terms were approved by the Bankruptcy Court.  See In re Lehman, 445 B.R. at 188.

_____

[14] The discussion at pages 162 through 163 of the Decision relate to the Rule 60(b) Motions also before the Bankruptcy Court at the 2010 Hearing.  However, that discussion necessarily informs the Bankruptcy Court's thinking with respect to the Clarification Letter as it relates to the Disputed Assets.  See generally In re Lehman, 445 B.R. at 188-90.

[15] It is certainly possible to read the Clarification Letter as not containing a material adverse change (as discussed in Part II.B and n.16 infra).

*This Amended Opinion & Order is being issued pursuant to the Second Circuit's Order permitting limited remand pursuant to Fed. R. App. P. 12.1, dated July 16, 2012.  The Court will also issue a consented-to judgment pursuant to that Order.

Additionally, it ignored the clear language of the Sale Order. The Sale Order by its terms does not contemplate that the Clarification Letter could make such material alterations to the terms of the Sale. The Sale Order approved the APA "along with any additional instruments or documents that may be reasonably necessary or appropriate to implement the Purchase Agreement, provided that such additional documents do not materially change its terms." [R. 388 (emphasis added).] Notably, however, the Sale Order defines the "Purchase Agreement" as both the APA (as amended) and the Clarification Letter (i.e., "that letter agreement clarifying and supplementing the [APA]") [R. 377], meaning that (a) the terms of the Sale as approved by the Bankruptcy Court were encapsulated by both documents; and (b) the only types of agreements or documents which could materially alter the terms of the "Purchase Agreement" were those agreements other than the APA and the Clarification Letter. In other words, the Bankruptcy Court misinterpreted--or exceeded the bounds of--its own Sale Order in finding that the Clarification Letter's transfer of the Margin Assets effected a material adverse change.

Third, the Bankruptcy Court held that despite the lack of formal approval, based upon the "widespread reliance" on the Clarification Letter, In re Lehman, 445 B.R. at 189, and

Barclays' "treat[ment] [of] the letter as binding when it agreed to close the transaction based on the terms of the Clarification Letter," id. at 190, the Clarification Letter is enforceable, id. Accordingly, the Bankruptcy Court decided that it would "regard the document as having been approved under the broad language of the Sale Order" and "interpret the Clarification Letter as an enforceable agreement to the same extent as if it had been separately approved after notice and hearing." Id. (emphasis added). That finding of enforceability (repeated numerous times) means that the Bankruptcy Court was required to "enforce" the Clarification Letter according to its plain language, as the Bankruptcy Court itself found. See id. at 187 ("To the extent that the Clarification Letter is treated as an enforceable document, the Court must interpret its plain language . . ."). However, based upon the Bankruptcy Court's slice-and-dice finding made nearly thirty pages earlier (i.e., that it would accept only "parts" of the Clarification Letter on their plain terms), the Bankruptcy Court ultimately layers on top of the Clarification Letter its own extrinsic understanding of the terms of the original deal, which allows it to excise the crystal clear transfer of the Margin Assets from the Clarification Letter's terms. See id. at 195-98.

*This Amended Opinion & Order is being issued pursuant to the Second Circuit's Order permitting limited remand pursuant to Fed. R. App. P. 12.1, dated July 16, 2012. The Court will also issue a consented-to judgment pursuant to that Order.

Therein lies the Bankruptcy Court's (additional) error with respect to the Margin Assets (as discussed further below): once the Bankruptcy Court has approved the letter in its entirety, "as if with notice and hearing," In re Lehman, 445 B.R. at 190, it was bound to interpret the agreements according to long-standing and clear principles of contract interpretation. Such principles do not allow, as discussed further below, turning to extrinsic evidence--i.e., the Bankruptcy Court's own understanding and experience during the Sale Hearing--to create ambiguity.  See WWW Assocs., Inc., 566 N.E.2d at 642.  It requires first, and perhaps only, reference to the clear language itself.  Crane Co. v. Coltec Indus., Inc., 171 F.3d 733, 737 (2d Cir. 1999).  Thus, the Bankruptcy Court's back-and-forth regarding approval is both irrelevant and wrong.  It is irrelevant because the Sale Order pre-approved and implemented the Clarification Letter.  It is wrong because the Bankruptcy Court did not have to re-approve the Clarification Letter because it had already done so in the Sale Order.

As stated, the Trustee's argument--that if the Clarification Letter materially alters the terms of the APA, then the Bankruptcy Court could not have approved it retroactively, see Tr. at 65:13-65:15, 100:2-100:4--is a backdoor to an appellate point never made.  The Trustee also argues that the Clarification Letter cannot be read to have

approved the transfer of the Margin Assets because that would violate the underlying purpose of the bankruptcy rules' protection of creditors. If the transfer of "cash"--billions of dollars of it--was approved, that could have "cataclysmic consequences." Tr. at 31:12-31:17. But, as the Bankruptcy Court implicitly acknowledged, if the Sale had not been approved, <u>that</u> would have been cataclysmic. <u>See</u> <u>In re Lehman</u>, 445 B.R. at 153.

If the Bankruptcy Court (and Trustee) are correct that the Clarification Letter did materially change the terms of the Sale,[16] the Trustee never appealed that point, leaving this Court without jurisdiction to address it. Thus, the Court now turns to resolving the cross-appeals on the Disputed Assets.

B.    <u>Margin Assets</u>

   1.    <u>Contract Interpretation Under New York Law</u>

---

[16] The Court finds it critical to note three points in this regard:  First, since exchange-traded derivatives were always included in Purchased Assets in the APA, business sense and logic dictate exchange-traded derivatives necessarily includes collateral; thus, spelling that out more explicitly in the Clarification Letter is not a material change.  Second, the Sale Order also contemplated transfer of any collateral underlying those exchange-traded derivatives held at the OCC because it acknowledged that "all obligations to the [OCC] with respect to Purchased Assets that are within the possession or control of OCC shall have been assigned to the Purchaser . . . ."  [R. 383.] Third, even the Trustee does not dispute the Bankruptcy Court's ability to approve the definition of "Purchased Assets" in the Clarification Letter, which includes "all of the assets of Seller used primarily in the Business or necessary for the operation of the Business."  [R. 61.]  The collateral relating to the exchange-traded derivatives specified in paragraph 1(a)(ii)(C) of the Clarification Letter did not materially alter that provision--it merely effectuated it.

*This Amended Opinion & Order is being issued pursuant to the Second Circuit's Order permitting limited remand pursuant to Fed. R. App. P. 12.1, dated July 16, 2012.  The Court will also issue a consented-to judgment pursuant to that Order.

Well-established principles of contract interpretation guide the Court's consideration of how the operative agreements deal with the Margin Assets.  State law principles of contract interpretation govern agreements executed by a debtor or trustee in bankruptcy.  In re Delta Air Lines, Inc., 608 F.3d 139, 146 (2d Cir. 2010); In re Lehman, 445 B.R. at 191.  The APA and Clarification Letter are just such contracts, governed by New York law.  See In re Lehman, 445 B.R. at 191.

As a threshold matter, a contract must be interpreted according to the parties' intent.  Crane Co., 171 F.3d at 737 (quoting Am. Express Bank Ltd. v. Uniroyal, Inc., 164 A.D.2d 275, 562 N.Y.S.2d 613, 614 (1st Dep't 1990)).  That intent is derived "from the plain meaning of the language employed in the agreements," id. at 737 (quotation marks and citation omitted), when the agreements are "read as a whole," WWW Assocs., Inc., 566 N.E.2d at 642.  Divining the parties' intent requires a court to "give full meaning and effect to all of [the contract's] provisions."  Katel Ltd. Liab. Co. v. AT&T Corp., 607 F.3d 60, 64 (2d Cir. 2010) (quotation marks omitted).  Courts must avoid "interpretations that render contract provisions meaningless or superfluous."  Manley v. AmBase Corp., 337 F.3d 237, 250 (2d Cir. 2003).  When the parties' intent is clear--i.e., unambiguous--the contract "must be enforced according to the plain meaning of its terms."  Lockheed Martin

_Corp._, 639 F.3d at 69 (citing _South Rd. Assocs., LLC v. IBM_, 4 N.Y.3d 272, 826 N.E.2d 806, 809 (N.Y. 2005)).  A contract is unambiguous where the contract's terms have "a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion."  _Id._ (citing _White v. Cont'l Cas. Co._, 9 N.Y.3d 264, 878 N.E.2d 1019, 1021 (N.Y. 2007)).

If reasonable minds could differ about the meaning of contractual language, such language is ambiguous, _see Lockheed Martin Corp._, 639 F.3d at 69 (contractual language is ambiguous when it "is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement"), and the court must turn to extrinsic evidence to determine the parties' intent, _State of New York v. Home Indem. Co._, 66 N.Y.2d 669, 486 N.E.2d 827, 829 (N.Y. 1985) (per curium).  Ambiguity, like intent, is determined by looking at the integrated agreement(s) "as a whole."  _Lockheed Martin Corp._, 639 F.3d at 69; _see also Kass v. Kass_, 91 N.Y.2d 554, 696 N.E.2d 174, 180 (N.Y. 1998) ("Ambiguity is determined by looking within the four corners of the document, not to outside sources.").  As the New York Court of Appeals admonished, extrinsic evidence should never "be considered in order to _create_ an ambiguity in the agreement."

---

*This Amended Opinion & Order is being issued pursuant to the Second Circuit's Order permitting limited remand pursuant to Fed. R. App. P. 12.1, dated July 16, 2012.  The Court will also issue a consented-to judgment pursuant to that Order.

WWW Assocs., Inc., 566 N.E.2d at 642.[17]

> ### 2.   Application of Contract Principles to the APA and the Clarification Letter

The question raised by Barclays regarding the Margin Assets is whether or not those assets were in fact part of the Sale. Barclays asserts that they were; the Trustee disagrees.  To answer that question, this Court must first examine the relevant contractual language in light of the long-standing principles of contract construction recited above.  There are two key provisions in the agreements on this question:  (a) Purchased Assets in the APA includes "exchange-traded derivatives" [R. 10]; and (b) the Clarification Letter further identified those specific Purchased Assets as "exchange-traded derivatives" and "(any property that may be held to secure obligations under such derivatives)" (referred to herein as the "'any property' parenthetical") [R. 61-62].  The Court finds that those two references are consistent and unambiguous: the Margin Assets were sold to Barclays.

The "any property" parenthetical is clear.  "[A]ny property" means "any property"--or, all property, if there is any to be had.  At oral argument on these cross-appeals, the parties agreed that "any property" includes "cash."  Tr. at

---

[17] See also id. ("It is well settled that extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous on its face." (quotation marks omitted)).

8:13-8:16.  Thus, the "any property" parenthetical is unambiguous that if there is any cash securing the exchange-traded derivatives included in Purchased Assets, that cash goes to Barclays in the Sale.  In that regard, the Clarification Letter states unequivocally that "[e]xcept as otherwise specified in the definition of 'Purchased Assets,' 'Excluded Assets' shall include any cash, cash equivalents, bank deposits or similar cash items of Seller and its Subsidiaries . . . ."  [R. 62 (emphasis added).]  That exception makes it clear that if the exchange-traded derivatives are secured by cash (as they of course were), such collateral definitionally constitutes a "Purchased Asset"--they are part of what is captured by the phrase "except as otherwise specified."  See Kass, 696 N.E.2d at 181 ("Where the document makes clear the parties' over-all intention, courts examining isolated provisions should then choose that construction which will carry out the plain purpose and object of the agreement." (quotation marks and alterations omitted)).

The clarity of the parties' intent in that regard is illuminated further by the Clarification Letter's definition of "Purchased Assets": "all of the assets . . . necessary for the operation of the Business."  [R. 61.]  Reading the "any

*This Amended Opinion & Order is being issued pursuant to the Second Circuit's Order permitting limited remand pursuant to Fed. R. App. P. 12.1, dated July 16, 2012.  The Court will also issue a consented-to judgment pursuant to that Order.

property" parenthetical with that intent in mind makes it perfectly clear that the parties intended the exchange-traded derivatives be transferred with supporting collateral. As a matter of fact and common sense, exchange-traded derivatives must have underlying collateral. Logically, then, collateral securing the exchange-traded derivatives is "necessary for the operation of the Business." [See R. 61.]

### 3.   The Trustee's Arguments[18]

The Trustee argues that the "any property" parenthetical is, in fact, ambiguous. At its core, and despite the fact that billions of dollars of the Margin Assets were transferred to Barclays after the Sale, the Trustee's argument is that if the agreements can be read to transfer "cash," there must have been a mistake made and that in itself evinces ambiguity. (See Br. of Appellee James W. Giddens, As Trustee for the SIPA Liquidation of Lehman Bros. Inc., 11 Civ. 6052 ("Trustee Opp'n") (Dkt. No. 24) at 32-36.) Understanding that no contractual doctrine of "mistake" can truly apply here (i.e., this is not a situation where one believes he or she is buying a milking cow

---

[18] The Court examines only those arguments regarding proper interpretation of the agreements--not those regarding weighing of extrinsic evidence; this Court does not find any ambiguity with regard to the sale of the Margin Assets that requires reference to extrinsic evidence. The Court notes, but does not rely upon, the many facts in the record regarding the parties' course of dealing supporting that everyone understood that proprietary margin was sold to Barclays. [See, e.g., R. 2636, 3117, 3130, 19912, 21570-73.]

but gets a bull),[19] the Trustee argues (and the Bankruptcy Court found) that an intention not to include cash must be read into the agreements at issue, creating ambiguity in what would otherwise be entirely clear phraseology.  The Trustee sets forth that argument in several ways.

First, the Trustee argues that the phrase "held to secure" in the parenthetical--"(and any property that may be held to secure obligations under such derivatives)"--is ambiguous.  The critical point, according to the Trustee, is that "held" does not mean held in all senses; it means "held" in a specific sense--i.e., held on behalf of customers--which notably excludes assets which were "posted" by LBI on its own behalf.  (Trustee Opp'n at 36-38.)  The Trustee argues that "held" used that way in the Clarification Letter is a term of art.

That argument creates ambiguity where there is none.  There

_____

[19] The Trustee's "mistake" argument reduced to its essence is that the Trustee did not understand, or know the terms of, the Clarification Letter when it signed it.  (See Trustee Opp'n at 34-36.)  A party's failure to read or understand a contract that it signs does not relieve it of its obligation to be bound by the contract.  Sorenson v. Bridge Capital Corp., 52 A.D.3d 265, 861 N.Y.S.2d 280, 282 (1st Dep't 2008) ("The general rule is that in the absence of a confidential relationship, [a] party who signs a document without any valid excuse for having failed to read it is conclusively bound by its terms." (quotation marks omitted; alterations added)); Vulcan Power Co. v. Munson, 89 A.D.3d 494, 932 N.Y.S.2d 68, 69 (1st Dep't 2011) ("Defendants' argument that the holding in Sorenson does not apply to signers of loose signature pages is without merit.  A signer's duty to read and understand that which is signed is not diminished merely because the signer was provided with only a signature page." (quotation marks and alterations omitted)).

*This Amended Opinion & Order is being issued pursuant to the Second Circuit's Order permitting limited remand pursuant to Fed. R. App. P. 12.1, dated July 16, 2012.  The Court will also issue a consented-to judgment pursuant to that Order.

is no basis anywhere in the agreements to read "held" as used in
the "any property" parenthetical as having any meaning other
than the dictionary definition of the term--i.e., the past tense
of "hold," meaning "to keep in custody" or "to have and maintain
in one's possession." Am. Heritage College Dictionary 660 (4th
ed. 2004). Accordingly, the plain meaning of the phrase "held
to secure" simply means that--kept in custody or maintained by
anyone to secure the exchange-traded derivatives purchased by
Barclays in the Sale. As this Court noted at oral argument, "if
you're not trying to limit [held] only to customers" (as the
phrase clearly reads), then the parties did not need any
modifying words--e.g., "by or on behalf of." Tr. at 60:1-60:3.
Of course, such modifying words in fact were not included.

    If the parties had meant "held by [a particular entity]"
(or not held by that particular entity), they could have--and
should have--said so. Indeed, a preceding clause in the same
paragraph uses "held" in that way: paragraph 1(a)(ii)(B) of the
Clarification Letter specifies that Purchased Assets include
"such securities and other assets held in LBI's 'clearance
boxes' . . . ." [R. 61 (emphasis added).] In that clause the
additional words "in LBI's clearance boxes" adds precisely the
type of specificity the parties wanted there; had they wanted
particular specificity only a few sentences later--i.e., in the
"any property" parenthetical--they could have included limiting

language, but did not.[20]  Thus, although the Trustee argues that "held" is, in the "any property" parenthetical, being used as a term of art (i.e., distinguishing "held" from "posted" assets), it is not so defined or used in such a manner anywhere in any agreements.

Further, reading "held" in the way the Trustee urges (and the Bankruptcy Court did)--i.e., to mean only customer property "held by LBI"--requires a limiting construction.  It requires excluding LBI proprietary margin "posted by LBI" and "held" by the OCC to secure LBI's trading positions.  Such limitation would require the addition of concepts not set forth in the agreements and the importation of language from outside sources. Such a construction works away from--rather than towards--the plain meaning of the contract, in contravention of the unambiguous language of the agreements and principles of New York contract law.

Such a reading also would render language in the Clarification Letter "superfluous," in contravention of principles of contract construction.  Specifically, paragraph

---

[20] The Trustee urges consideration of the TAA for the fact that "held" there is modified by the phrase "by OCC." [See R. 55.1.]  That usage further disproves that "held" was being used as a term of art, but rather supports its use according to its everyday definition since what was "held" by the OCC was only proprietary margin.

*This Amended Opinion & Order is being issued pursuant to the Second Circuit's Order permitting limited remand pursuant to Fed. R. App. P. 12.1, dated July 16, 2012.  The Court will also issue a consented-to judgment pursuant to that Order.

8(i) of the Clarification Letter, regarding the transfer of customer accounts, provides that Barclays "shall receive . . . for the account of the customer, any and all property of any customer, including any held <u>by or on behalf of LBI to secure the obligations of any customer</u> . . . ." [R. 64 (emphasis added).] The Trustee's reading of "held" in the Clarification Letter to always mean "held on behalf of customers" renders the "held by or on behalf of" clause in paragraph 8(i) unnecessary, which, under New York contract law, this Court may not do. <u>See</u> <u>Manley</u>, 337 F.3d at 250.

Thus, this Court construes "held" according to its ordinary meaning, <u>see</u> Tr. at 16:22-16:24--a position supported further by the principle of contract construction requiring a presumption of consistent usage (unless otherwise indicated) of words used in the same paragraph. <u>See</u> <u>South Rd. Assocs., LLC</u>, 826 N.E.2d at 809-10; <u>see also</u> <u>Kass</u>, 696 N.E.2d at 181 ("Form should not prevail over substance and a sensible meaning of words should be sought." (quotation marks omitted)).

Second, the Trustee asserts that there is ambiguity in the agreements because the inclusion of "exchange-traded derivatives" in Purchased Assets [R. 61] directly conflicts with the exclusion of "derivatives contracts" in clause (n) of Excluded Assets in the APA [R. 8]. That is a red herring--the two clauses are easily reconcilable. <u>See</u> <u>Seabury Constr. Corp.</u>

36

v. Jeffrey Chain Corp., 289 F.3d 63, 69 (2d Cir. 2002) ("General canons of contract construction require that where two seemingly conflicting contract provisions reasonably can be reconciled, a court is required to do so and to give both effect." (quotation marks omitted)).

Paragraph 1(c) of the Clarification Letter enumerates certain Excluded Assets: "[a]ll of the investments held by Seller or their Subsidiaries in collateralized debt obligations, collateralized loan obligations, over-the-counter derivatives, TBA mortgage notes and similar asset-backed securities and corporate loans." [R. 62.] That is an inventory of, inter alia, certain "derivatives contracts" that the parties excluded from the Sale. Clause (n)'s exclusion of "derivatives contracts" encompasses anything not specifically included in paragraph 1(c)'s enumeration. Reading the agreements as an "integrated document" without rendering any provision "superfluous" simply means that the APA's clause (n) and paragraph 1(c)'s enumeration can be read such that Excluded Assets includes "derivatives contracts, [including but not limited to] collateralized debt obligations, collateralized loan obligations, over-the-counter derivatives, TBA mortgage notes. .

---

*This Amended Opinion & Order is being issued pursuant to the Second Circuit's Order permitting limited remand pursuant to Fed. R. App. P. 12.1, dated July 16, 2012. The Court will also issue a consented-to judgment pursuant to that Order.

. ."  [See R. 8, 62.][21]  That reading is consistent with
accompanying clear contractual language that a different type of
derivative instrument, "exchange-traded derivatives (and any
property that may be held to secure obligations under such
derivatives)," are Purchased Assets.  As the Sale Order
explicitly recognized, the Clarification Letter was meant to
(and did) "clarify[] and supplement[] the [APA]."  [R. 377.]
Reading paragraph 1(c)'s list as an "including but not limited
to" enumeration of clause (n)'s "derivatives contracts" is clear
when read in that context.  See Seabury Constr. Corp., 289 F.3d
at 69.[22]

     Moreover, if this Court were to accept the Trustee's
reading of the APA's Excluded Assets clause (n) " . . .
derivatives contracts" as including exchange-traded derivatives,
that would create a conflict between that provision and the
definition of Purchased Assets in the APA itself which includes
exchange-traded derivatives.  There, Purchased Assets included
"government securities, commercial paper, corporate debt,
corporate equity, exchange traded derivatives and collateralized
short-term agreements . . . ."  [R. 10 (emphasis added).]  Thus,

---

[21] There is no doubt that including both paragraph 1(c)'s enumeration and the
APA's clause (n) constitutes inartful drafting likely borne of the "fog of
Lehman"--the 48-hour negotiation of the largest asset sale in bankruptcy
history--but including both does not render the agreements ambiguous.
[22] This is further supported by the definition of the term "including" in the
APA as "including, without limitation."  [R. 14.]

"exchange-traded derivatives" were never captured by the exclusion of "derivatives contracts"[23] in clause (n) of the APA--i.e., the agreements always treated exchange-traded derivatives separately from "derivatives contracts," not just in the Clarification Letter.  Under that reading alone, it is clear that exchange-traded derivatives (and necessarily then, their underlying collateral) were always intended to be purchased by Barclays, but that all other derivatives contracts were not.[24]

Further, if the Court accepts the Trustee's argument that "derivatives contracts" captures "exchange-traded derivatives," then the "any property" parenthetical, to be given any meaning at all, would have to relate only to customer accounts; but that reading, in turn, renders paragraph 8 of the Clarification Letter (which specifically relates to customer accounts) mere surplusage.  There would be no reason to have the "any property" parenthetical if it only related to customer accounts dealt with elsewhere in the agreements (e.g., paragraph 8 of the

---

[23] The use of "contracts" to modify derivatives is peculiar given that all derivatives (whether traded on an exchange or over-the-counter) necessarily are contracts.  The use of that modifier, however, does not render the term ambiguous.

[24] In addition, nothing anywhere specifies that any form of derivative instrument was to be separated from its collateral.

*This Amended Opinion & Order is being issued pursuant to the Second Circuit's Order permitting limited remand pursuant to Fed. R. App. P. 12.1, dated July 16, 2012.  The Court will also issue a consented-to judgment pursuant to that Order.

Clarification Letter).[25]

Third, the Trustee argues that ambiguity--even if this Court does not find it in the language of the agreements--is evident upon consideration of the circumstances in which the "any property" parenthetical purportedly was inserted.  As discussed above, that switches the order of a court's task when interpreting a contract.  The court first examines the language for ambiguity; in the absence of ambiguity, a court is required to give the words of the contract their plain meaning, see Crane Co., 171 F.3d at 737; only if a court finds ambiguity does the extrinsic evidence become relevant, Home Indem. Co., 486 N.E.2d at 829.  Thus, the Trustee's argument puts the proverbial cart before the horse.

The Bankruptcy Court also found ambiguity first when it reverted to its own understanding at the time of the Sale as to what assets were and were not included in the Sale and with reference to the negotiating history among the parties.  See In re Lehman, 445 B.R. at 196-99.  The Bankruptcy Court erred in considering the "extrinsic evidence surrounding [the

---

[25] The Trustee--and the Bankruptcy Court--read into the phrase "exchange-traded derivatives" a difference in those held by Lehman customer and those held by Lehman itself since no one disputes (and no one appealed) the transfer of the $2 billion of Margin Assets held on Lehman's customer's behalf that was transferred to Barclays in the Sale.  Such a reading is likely informed by paragraph 8(i) of the Clarification Letter, which (also unambiguously) transfers "for the account of any customer, any and all property of any customer, including any held by or on behalf of LBI to secure the obligations of any customer, whose account(s) are being transferred to Purchaser as part of the Business."  [R. 64.]

Clarification Letter's] negotiation, execution, and implementation," In re Lehman, 445 B.R. at 191, without first making a preliminary finding that the language of the "any property" parenthetical was in fact ambiguous.  That runs contrary to clear principles of contract interpretation.  See WWW Assocs., Inc., 566 N.E.2d at 642.

As set forth at some length above, the Bankruptcy Court found that the Clarification Letter is an enforceable contract, as if approved after notice and a hearing.  Thus, the Bankruptcy Court was required to interpret both it and the APA according to their own terms, within their four corners--without reference to extrinsic evidence, unless there was an ambiguity.  Cf. In re Lehman, 445 B.R. at 191 ("Close inspection of the plain text of the Clarification Letter, as well as the extrinsic evidence surrounding its negotiation, execution, and implementation . . ." (emphasis added)).  As this Court noted at the oral argument:

> There is a situation that arises, I think due to the unique circumstances perhaps of what was going on at the time in which the bankruptcy court was quite personally involved . . . that the circumstances lead the [Bankruptcy] court to . . . bring ambiguity to its reading of the contract as opposed to stepping back from the contract and reading it as if it were just black and white letters on a page.

Tr. at 9:13-9:20.  Judge Peck himself noted in the Decision that his "own experience during the Sale Hearing" was "a factor" in

*This Amended Opinion & Order is being issued pursuant to the Second Circuit's Order permitting limited remand pursuant to Fed. R. App. P. 12.1, dated July 16, 2012.  The Court will also issue a consented-to judgment pursuant to that Order.

deciding "that Barclays is not entitled to any 'Lehman Cash.'"[26]
In re Lehman, 445 B.R. at 162.  References to his personal
recollection precipitated a cart-before-the-horse,
result-oriented decision regarding the Margin Assets rather than
one firmly grounded in the documents themselves.  The unusual
circumstances surrounding the Sale notwithstanding, this Court
is required to apply settled rules of contract interpretation.
To the extent the Bankruptcy Court may have imputed its own
intent regarding the Sale to interpret the agreements, rather
than relying upon the plain language of the APA and
Clarification Letter, that was error.[27]

New York courts have agreed that deciding ambiguity
requires examination of "the entire contract," as well as "'the

---

[26] The Trustee's argument that because Barclays "joined in representing to the
[Bankruptcy Court] that no cash was being transferred" it cannot now say that
it believed that cash was being transferred ignores the plain language of the
Clarification Letter (as well as, incidentally, the factual history of the
"no cash" representation).  It ignores the plain language of the
Clarification Letter which revised "Excluded Assets" to no longer include
"Retained Cash" and to add the clause, "[e]xcept as otherwise specified in
the definition of 'Purchased Assets.'"  [R. 62.]  (It ignores the factual
history of the purported "no cash" representation--on which this Court does
not rely in any way for its decision on the Margin Assets--because it does
not give credence to the fact that the parties represented that "no cash" was
going to Barclays precisely because all parties believed there was no cash to
be had.  [R. 1428, 1592.]  The Trustee's argument that the purported "no
cash" representation made at the Sale Hearing elucidates the parties' intent
fails for the same reason.)

[27] Further, even if the Bankruptcy Court could have turned to extrinsic
evidence (and as discussed above, it could not), it failed to consider other
types of extrinsic evidence--e.g., post-closing course of dealing--that it
considered when interpreting the agreements relating to other Disputed Assets
(e.g., the Clearance Box Assets).  See In re Lehman, 445 B.R. at 201.
Failure to consider the full record when reviewing the extrinsic evidence is
additional error, but the Court need not reach that issue for purposes of
these cross-appeals.

relation of the parties and the circumstances under which it was executed.'" Kass, 696 N.E.2d at 180 (quoting Atwater & Co. v. Panama R.R. Co., 246 N.Y. 519, 524, 159 N.E. 418 (N.Y. 1927)) (emphasis added).  However, review of the type of he-said, she-said back-and-forth pursuant to which the "any property" parenthetical purportedly was written into the contract amounts to consideration of extrinsic evidence--and goes well beyond the type of "circumstances" meant by the New York Court of Appeals in Atwater (and its progeny).  The "circumstances" which could properly have been considered by the Bankruptcy Court are that the parties sought to facilitate an expeditious sale of Lehman's assets to Barclays in order to save jobs and salvage the American economy from (further) deterioration.  See Schmidt v. Magnetic Head Corp., 97 A.D.2d 151, 468 N.Y.S.2d 649, 654 (2d Dep't 1983) ("In construing the provisions of a contract, ascertainment of the intention of the parties is paramount and due consideration must given to the purpose of the parties in entering into the contract." (citations omitted)).  Only those "circumstances" could have been considered here to elucidate the parties' intent--not the minutiae of contract formation and negotiation which precipitated the Sale (i.e., extrinsic evidence), as the Bankruptcy Court did.  If the law were

---

*This Amended Opinion & Order is being issued pursuant to the Second Circuit's Order permitting limited remand pursuant to Fed. R. App. P. 12.1, dated July 16, 2012.  The Court will also issue a consented-to judgment pursuant to that Order.

otherwise, courts would no longer have to find ambiguity first before resorting to extrinsic evidence.

Fourth, the Trustee argues that Section 2.2 of the APA explicitly precludes transfer of the Margin Assets.  See Tr. at 45:4-45:14, 58:23-59:3, 61:17-61:25.[28]  Section 2.2 of the APA provides, "Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Seller (directly and indirectly) shall retain all right, title and interest to, in and under the Excluded Assets."  [R. 15.] According to the Trustee, once "cash" is an "Excluded Asset," section 2.2 of the APA "trumped" anything else--i.e., "[t]here was nothing within the purchase agreement that could be effective to put it [i.e., cash] in purchased assets once it was an excluded asset."  Tr. at 45:8-45:11.  The Trustee went on to explain that the only way that any cash could properly be considered a Purchased Asset--i.e., to "get it in the deal"--was "to take it out of excluded assets" and "[t]hen . . . to put it in the deal."  Tr. at 45:11-45:13.  But that is precisely what the Clarification Letter does.  The definition of Excluded Assets in the Clarification Letter states, "Except as otherwise specified in the definition of 'Purchased Assets,' 'Excluded

---

[28] The Trustee raised this argument for the first time at the oral argument on the cross-appeals. (See generally Trustee Opp'n at 28-52.)  While courts typically do not consider arguments raised for the first time at oral argument, see Keefe v. Shalala, 71 F.3d 1060, 1066 n.2 (2d Cir. 1995), Barclays had an adequate opportunity to address the matter at oral argument and the Court will address it here for completeness' sake.

Assets' shall include any cash . . . ."  [R. 62.]  The "except"
clause thus carves out of Excluded Assets any cash related to--
or underlying--the Purchased Assets.  The "any property"
parenthetical accomplishes the second step set out by the
Trustee--i.e., it includes cash to the extent that it comprises
"any property that may be held to secure obligations" under
LBI's "exchange-traded derivatives."  [See R. 62.]  Thus, by the
Trustee's own reasoning, the agreements, when read together,
still may be understood to include the Margin Assets.[29]

### 3.    The Transfer & Assumption Agreement

This Court reaches its conclusion that Barclays purchased
the Margin Assets based upon the language of the APA and the
Clarification Letter alone.  However, between the Sale Hearing
on September 19, 2008, and the closing three days later (on
September 22, 2008), Barclays, the Trustee, and the OCC entered
into an additional contract--the Transfer and Assumption
Agreement ("TAA").  [R. 55.1-55.3.]  The TAA was signed on
September 20, 2008, and provides that Lehman (upon whose behalf
the Trustee was now acting) will "transfer its rights,

---

[29] Further, the "burden" shifts between the APA and the Clarification Letter
with respect to any "cash" that is a Purchased versus Excluded Asset.  In the
APA, section 2.2 reads that "[n]othing herein" can give over an Excluded
Asset to Barclays [R. 15] whereas paragraph 1(c) of the Clarification Letter
states that "[e]xcept as otherwise specified in the definition of 'Purchased
Assets,'" no cash is transferred to Barclays [R. 62].

*This Amended Opinion & Order is being issued pursuant to the Second
Circuit's Order permitting limited remand pursuant to Fed. R. App. P. 12.1,
dated July 16, 2012.  The Court will also issue a consented-to judgment
pursuant to that Order.

obligations and liabilities under and in respect of" certain accounts at the OCC to Barclays and that Barclays will "accept the transfer of all of Lehman's rights, obligations and liabilities under and in respect of" those accounts.  [R. 55.1.] The accounts at the OCC for which Lehman was to transfer its rights and obligations were "account numbers 7, 84, and 273" (defined as the "Account").  [R. 55.1.]  The parties agree that account numbers 7, 84, and 273 refer to LBI's OCC accounts, and that the only margin assets in those accounts were Lehman proprietary margin assets, Tr. at 17:2-17:4--that is, they are accounts containing a significant portion of the Margin Assets at issue on Barclays' appeal.

In the TAA, Lehman agreed to "sell[], assign[], transfer[] and set[] over to Barclays," inter alia, "all margin deposits held by OCC with respect to the Account."  [R. 55.1.]  The parties--notably for purposes of this appeal, the Trustee and Barclays--represented and warranted that the TAA was a "legal, valid and binding agreement, enforceable against [them] in accordance with its terms."  [R. 55.2.]

The Bankruptcy Court's Sale Order contains a series of "findings," one of which is particularly relevant to the TAA. [See R. 378-388.]  Finding (N) states that " . . . as of the Closing Date, all obligations to [OCC] with respect to Purchased Assets that are within the possession or control of OCC shall

have been assigned to the Purchaser . . ." and that "all securities, cash, collateral and other property transferred to accounts of the Purchaser at OCC shall be subject to all rights of OCC therein . . . ." [R. 383.]

The execution of the TAA, anticipated in the Sale Order itself in Finding (N), unquestionably supports that conclusion. Without the execution of the TAA, the reference in the Sale Order's Finding (N) would be precatory only--it needed an implementing agreement, i.e., the TAA. The TAA (executed by the parties to the APA and the Clarification Letter after the Sale Hearing but before finalizing--and executing--the Clarification Letter) necessarily informed the drafting of the Clarification Letter. The Bankruptcy Court expected and approved that the parties would undertake the actions "reasonably necessary to implement the transactions contemplated by the Purchase Agreement." [R. 388 (Sale Order).][30] The TAA is just such an

---

[30] The Trustee urged at oral argument that the TAA cannot be enforced against it because it was not specifically court-approved. Tr. at 50:13-51:11. As an initial matter, as stated above, the Sale Order allowed the parties to "take all other and further actions as may be reasonably necessary to implement the transactions contemplated by the [APA]." [R. 388.] Because the TAA enabled the parties to implement the transaction regarding the purchase of the "exchange-traded derivatives (and any property that may be held to secure obligations under such derivatives)," it is the type of "action" contemplated by the Sale Order. However, the Bankruptcy Court found that because the TAA "never was presented to the Court," it "cannot be dispositive as to the parameters of the deal that the Court approved." In re Lehman, 445 B.R. at 197 n.38.

*This Amended Opinion & Order is being issued pursuant to the Second Circuit's Order permitting limited remand pursuant to Fed. R. App. P. 12.1, dated July 16, 2012. The Court will also issue a consented-to judgment pursuant to that Order.

agreement--implementing the transaction with respect to the
Margin Assets contemplated by the Clarification Letter.  The
very existence of the TAA and its reference to proprietary
margin means that the term "held" must encompass those assets
and not be as limited as the Trustee urges; otherwise, the TAA
would have no purpose.  Principles of contract construction
favor interpretation which does not render an agreement--or any
provision thereof--surplusage.  See Manley, 337 F.3d at 250.

     As discussed above, in the TAA, Lehman transferred "all
margin deposits held by OCC with respect to" account numbers 74,
84, and 273 at the OCC.  [R. 55.1.]  As the parties conceded at
oral argument, the only margin assets in those accounts were
Lehman proprietary margin assets--that is, the Margin Assets
that are among those here in dispute.  Tr. at 17:2-17:4.  Even
though at the time of the Sale the parties may have had a
different understandings about what was in those accounts (hence

---

The Trustee also argued that contracts that have not been specifically
approved by a Bankruptcy Court are not enforceable.  The cases cited by the
Trustee in its post-hearing submission on this point do not stand for the
proposition that the TAA is unenforceable, but rather that assets dispersed
from a bankrupt estate outside the ordinary course of business requires
explicit court approval.  See In re Photo Promotion Assocs., Inc., 881 F.2d
6, 7-10 (2d Cir. 1989) (upholding the bankruptcy court's decision requiring
that a creditor remit funds obtained as a result of unauthorized postpetition
transfers prior to its determination on the creditor's priority claim); In re
New Jersey Mobile Dental Practice, P.A., Nos. 05-17772, 07-1988, 2008 WL
1373706, at *5-6 (Bankr. D.N.J. Apr. 7, 2008) (Debtor could avoid post-
petition transfer under 11 U.S.C. § 549 because the transfers were not
authorized by the bankruptcy court and were not in the ordinary course of
business); In re LWD, Inc., No. 5:05-CV-108, 2007 WL 2668512, at *1-2, 5
(W.D. Ky. Sept. 6, 2007) (denying motion for reconsideration requiring the
acquirer to return certain assets to the debtor) (cited in Dkt. No. 33).
Accordingly, those cases have no effect on the Court's decision here.

the representation at the Sale Hearing that no cash existed to be transferred to Barclays), executing the TAA (contemporaneously with the APA, Clarification Letter, and the Sale Order) to carry out the parties' intention with respect to the collateral underlying the Margin Assets meant the parties intended that if Lehman had 27 cents in accounts 74, 84, and 273 at the OCC, those 27 cents would go to Barclays in the Sale. One of the primary reasons for the fight between Barclays and the Trustee over the Margin Assets (if not the only reason) is that approximately $2 billion was maintained in accounts 74, 84 and 273 at the OCC--not 27 cents.  The purported ignorance over what those accounts contained cannot excuse (or rewrite) explicit contractual language--language signed onto by the Trustee not only in the TAA, but also in the Clarification Letter.[31]  As stated above, this Court did not consider the TAA in reaching its conclusion on the Margin Assets; the Court merely reviewed its terms here as additional support for the conclusion at which it arrived based upon the unambiguous terms of the APA and the Clarification Letter only.

---

[31] In Finding (N), the Sale Order also specifically anticipated the TAA transfer, stating that all obligations at the OCC transfer to the Purchaser [i.e., Barclays] and that all securities, cash, and collateral at the OCC transferred to the Purchaser shall be subject to all rights of the OCC.  [R. 383.]

*This Amended Opinion & Order is being issued pursuant to the Second Circuit's Order permitting limited remand pursuant to Fed. R. App. P. 12.1, dated July 16, 2012.  The Court will also issue a consented-to judgment pursuant to that Order.

4.   Margin Assets:   Conclusion

The APA and Clarification Letter are unambiguous with respect to the transfer of the Margin Assets.   Thus, it was error for the Bankruptcy Court to consider extrinsic evidence in interpreting those two agreements.   See Lockheed Martin Corp., 639 F.3d at 71.   Read on their face, the agreements clearly provide for a sale of all Margin Assets to Barclays. Accordingly, the decision of the Bankruptcy Court with respect to the Margin Assets is reversed (except as provided in Part II.B infra regarding the $507 million held at the OCC that is part of the 15c3-3 Assets), and thus, the award of prejudgment interest relating thereto also is reversed.[32]

C.   15c3-3 Assets

Paragraph 8 of the Clarification Letter governs disposition of the 15c3-3 Assets and provides, in pertinent part, that "Purchaser shall receive":

> All customer accounts of LBI (other than customers who are Affiliates of LBI) shall be transferred to Purchaser.  In connection therewith, Purchaser shall receive . . . (ii) to the extent permitted by applicable law, and as soon as practicable after the Closing, $769 million of securities, as held by or on behalf of LBI on the date hereof pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934, as

---

[32] The Court would be within its discretion to award prejudgment interest to Barclays.  See Jones v. UNUM Life Ins. Co., 223 F.3d 130, 139 (2d Cir. 2000); SEC v. First Jersey Secs., Inc., 101 F.3d 1450, 1476 (2d Cir. 1996).  The Court finds, however, that in these circumstances Barclays should retain the Margin Assets already delivered to it and should receive the undelivered Margin Assets.  The Court declines to award interest payable by the Trustee to Barclays.

amended, or securities of substantially the same
nature and value.

[R. 64.]

The Bankruptcy Court held that such language means that "in
the event of a deficit in LBI's customer reserve accounts, SIPA
and Rule 15c3-3 may prevent the SIPA Trustee from transferring
any property from these accounts." In re Lehman, 445 B.R. at
192.  Barclays appeals the Bankruptcy Court's ruling that
Barclays was not entitled to the 15c3-3 Assets "unless and until
the Trustee satisfies all customer claims." (Barclays Br. at 6,
64.)  See also In re Lehman, 445 B.R. at 192, 195.  Both the
Securities and Exchange Commission ("SEC") and SIPC submitted
briefs in support of the Bankruptcy Court's Decision on the
15c3-3 Assets.  (See 11 Civ. 6053, Br. of Statutory Party Secs.
& Exch. Commission, 11 Civ. 6053 (Dkt. No. 22) ("SEC Br."); 11
Civ. 6053, Br. of the Secs. Investor Protection Corp. (Dkt. No.
23) ("SIPC Br.").)

Barclays first argues that the Bankruptcy Court erred in
barring the transfer of $507 million in margin deposits held at
the OCC which were listed as a "debit item" in LBI's reserve
account.  (Barclays Br. at 63-64.)  See In re Lehman, 445 B.R.
at 192 n.32.  Barclays argues (somewhat persuasively) that
"applicable law" applies only to the Reserve Bank Accounts

*This Amended Opinion & Order is being issued pursuant to the Second
Circuit's Order permitting limited remand pursuant to Fed. R. App. P. 12.1,
dated July 16, 2012.  The Court will also issue a consented-to judgment
pursuant to that Order.

created under Rule 15c3-3 and that, to the extent any assets are/were held outside those accounts, they only can be used as a debit to the account, but cannot be subject to Rule 15c3-3's strictures. (Barclays Br. at 63-64.) The SEC and SIPC disagree.

Although the $507 million is/was held at the OCC, according to both the SEC and SIPC it is still considered part of LBI's required Reserve Bank Account. (SEC Br. at 9-10; see also SIPC Br. at 15 ("Customer property also comprised all of the items under the Reserve Formula, wherever they were located, including the $507 million.").) Rule 15c3-3 allows amounts held outside of the Reserve Bank Account to be debited to it. Thus, both public policy and "applicable law" support the finding that amounts held outside of the Reserve Bank Account were nonetheless part of it and not available for transfer. Transferring assets from outside the Reserve Bank Account that clearly were debited to it would violate Rule 15c3-3's requirement that the Reserve Bank Account hold a specified amount "at all times." See In re Lehman, 445 B.R. at 192 n.32; see also 17 C.F.R. § 250.15c3-3(e)(1), (2). In other words, there would be a deficit in the Reserve Bank Account in violation of "applicable law." (See SEC Br. at 9-10.) The Court finds the Bankruptcy Court's Decision that Barclays is not entitled to the $507 million held at the OCC debited to Lehman's

Reserve Bank Account because it would circumvent Rule 15c3-3's policy of "giving priority treatment to customers of a liquidating broker-dealer" fully supportable. See In re Lehman, 445 B.R. at 195 (citing 15 U.S.C. § 78fff-2(c)).

Barclays also argues that even if the specific assets debited to the Reserve Bank Account were not available, the Bankruptcy Court erred in barring transfer of "securities of substantially the same nature and value" as the $769 million of securities in the Reserve Account. (Barclays Br. at 65.) The Bankruptcy Court correctly found that the phrase "securities of substantially the same nature and value" in paragraph 8 of the Clarification Letter protected any changes in the "particular securities held in the accounts." In other words, if the type of securities in the Reserve Bank Account changed, they would be replaced and maintained in compliance with "applicable law." That interpretation "elevate[s] the rights of LBI's customers in order to avoid giving an interpretation that would conflict with governing law." In re Lehman, 445 B.R. at 193. Although the Bankruptcy Court never explicitly found an ambiguity with the "substantially the same nature" clause, it considered extrinsic evidence on this point. With that consideration, the Bankruptcy Court concluded that the phrase applied to the securities within

---

*This Amended Opinion & Order is being issued pursuant to the Second Circuit's Order permitting limited remand pursuant to Fed. R. App. P. 12.1, dated July 16, 2012. The Court will also issue a consented-to judgment pursuant to that Order.

the Reserve Bank Account--i.e., if securities were removed from
the account, securities of "substantially the same nature" had
to be replaced in the account.  See id.  The Bankruptcy Court
also found that the extrinsic evidence submitted by Barclays on
this point did not support a meeting of the minds, but rather
only Barclays' counsel's "unexpressed subjective intent."  Id.
at 193-194.  This Court does not find error in those
conclusions.

Barclays also seeks to find a way around "applicable law"
by arguing that the Trustee is not subject to Rule 15c3-3
because the Trustee is not a registered broker or dealer.
(Barclays Br. at 68-70.)  But, as the SEC and SIPC make clear in
their respective briefs, Rule 15c3-3 still applies to the
Trustee because he is "continuing to resolve claims for
securities and close out transactions."  (SEC Br. at 6; see also
SIPC Br. at 15 ("SIPA trustees are permitted, in certain limited
circumstances, to effect transfer of property").)

Accordingly, the Decision of the Bankruptcy Court regarding
the 15c3-3 Assets is affirmed.

D.   Clearance Box Assets

As noted above, there is a direct conflict (and thus,
ambiguity) with respect to how the Clarification Letter and the
DTCC Letter treat the Clearance Box Assets.  The former
classifies Clearance Box Assets as Purchased Assets (that would

therefore be transferred to Barclays as part of the Sale) while the latter defines them as Excluded Assets.  When reading the two letters as integrated agreements, those two provisions cannot be reconciled.  They create ambiguity.  See 242-44 E. 77th St., LLC v. Greater N.Y. Mut. Ins. Co., 815 N.Y.S.2d 507, 511 (1st Dep't 2006) ("Where [a contract] reasonably lends itself to two conflicting interpretations, its terms are ambiguous . . .").  Thus, the Bankruptcy Court correctly referred to relevant extrinsic evidence.  See Home Indem. Co., 486 N.E.2d at 829; Red-Kap Sales, Inc. v. N. Lights Energy Prods., Inc., 942 N.Y.S.2d 283, 284 (3d Dep't 2012).  The Bankruptcy Court's factual findings on the extrinsic evidence are accorded great deference and can only be reversed if clearly erroneous.  See In re Kalikow, 602 F.3d at 91.  The recitation of facts below is based upon the Bankruptcy Court's findings.

During Lehman Week, the DTCC became involved in the negotiations regarding the Sale prior to the Sale Hearing.  In re Lehman, 445 B.R. at 199.  The Clearance Box Assets, as assets that "facilitated securities trading by providing collateral to secure open trading positions," provided DTCC "a means to manage risks associated with its daily clearing operations."  Id. Thus, if LBI defaulted on any of its trades, DTCC sought

*This Amended Opinion & Order is being issued pursuant to the Second Circuit's Order permitting limited remand pursuant to Fed. R. App. P. 12.1, dated July 16, 2012.  The Court will also issue a consented-to judgment pursuant to that Order.

recourse in the Clearance Box Assets to cover those liabilities.
Id.  If the Clearance Box Assets went to Barclays, the DTCC
would be without that recourse and thus, the DTCC turned to
Barclays for assurance--or some sort of guarantee for any failed
trades.  Id.  The Bankruptcy Court found that prior to the Sale
Hearing, Lehman and Barclays entered an agreement--and informed
the Bankruptcy Court as much--under which the "DTCC would
consent to the transfer of the Clearance Box Assets and Barclays
would provide DTCC with a $250 million guarantee along with a
pledge of billions of dollars in residential mortgage-backed
securities ['RMBS'] as collateral."  Id. at 199 & n.43.  [See
also R. 41227 (First Amendment to APA).][33]  Subsequent to the
Sale Hearing, the RMBS that were to be used as collateral for
the DTCC became unavailable.  In re Lehman, 445 B.R. at 199.
(Neither the Bankruptcy Court nor the Trustee provide a reason
for that unavailability.)  Thus, Lehman, Barclays, and the DTCC
entered into "[e]xtensive negotiations" to resolve the DTCC's
need for a guarantee.  Id.  The DTCC demanded that Barclays

---

[33] "Notwithstanding any other provision of the [APA], the Purchaser shall
retain a portion of the Purchase Price equal to two hundred fifty million
dollars ($250,000,000)(such amount the 'Holdback') to secure the LBI
obligations that the Purchaser has been required to guarantee (the
'Guaranteed Obligations') with the Depository Trust Clearing Corporation . .
. .  To the extent that the value of fifty percent (50%) of the residential
real estate mortgage securities transferred as part of the [APA] (such fifty
percent (50%) the 'Residential Adjustment') plus the Holdback exceeds the
amount of the Guaranteed Obligations, Purchaser shall transfer the
Residential Adjustment and the Holdback to the Seller as promptly as
practicable following settlement of all Guaranteed Obligations." (certain
parentheticals omitted).

provide a full guarantee for any liabilities the DTCC sustained in exchange for the Clearance Box Assets.  Id.  However, Barclays agreed only to the $250 million guarantee it had originally provided, not to the unlimited guarantee DTCC sought. Id.  From this disagreement arose the two "seemingly contradictory" letters that form the basis for the dispute over the Clearance Box Assets.  See id. at 199-200.

The Bankruptcy Court found that the extrinsic evidence regarding the parties' intent as to the Clearance Box Assets was "not entirely consistent."  Id. at 201.  The Bankruptcy Court considered the testimony of the deputy general counsel (and a managing director) of the DTCC, Isaac Montal, and found that Mr. Montal's "credible" testimony "would support a finding that Barclays gave up any claim to the Clearance Box Assets."  Id. Specifically, Montal testified that three telephone calls between Barclays and the DTCC occurred on September 21, 2008-- the last of which included an agreement by Barclays to relinquish the Clearance Box Assets.  Id.  [See also R. 56800 (Montal testified that there were "numerous phone calls throughout the afternoon and evening" of September 21, 2008 which culminated in a "midnight" call on which Barclays said "they weren't taking anything," which "ensured that the assets

*This Amended Opinion & Order is being issued pursuant to the Second Circuit's Order permitting limited remand pursuant to Fed. R. App. P. 12.1, dated July 16, 2012.  The Court will also issue a consented-to judgment pursuant to that Order.

would be available [to the DTCC] in the Lehman accounts to settle the open obligations that existed").]

The Bankruptcy Court credited further extrinsic evidence in the form of (1) post-closing conduct "manifesting the[] [parties'] intent to transfer the Clearance Box Assets to Barclays"--e.g., Lehman and Barclays' efforts to finalize Schedule B to the Clarification Letter which listed the Clearance Box assets, other post-closing documents "showing that the Purchased Assets acquired by Barclays included the Clearance Box Assets"--and (2) testimony from "Barclays' lawyers and negotiators" which confirmed the "intent to transfer the Clearance Box Assets to Barclays." In re Lehman, 445 B.R. at 201. In addition to extrinsic evidence in Barclays' favor emanating from Barclays, the Bankruptcy Court also considered a March 31, 2009 email from Sheldon Hirshon of Proskauer Rose LLP, outside counsel for the DTCC, in which he relayed "his understanding that, during the weekend of negotiations following the Sale Hearing, DTCC agreed to relinquish the Clearance Box Assets and accept only the $250 million limited guarantee." In re Lehman, 445 B.R. at 201.[34] The Bankruptcy Court found that "understanding" in line with the "ultimate commercial reality of

---

[34] [See also R. 3732 ("The $250mm Barclays guarantee and the resi's were to be provided to protect DTCC from any losses it would incur as a result of not ceasing to act for LBI. As I said, the resi's were pulled from the deal leaving only the Barclays guarantee and, after internal review of the situation, DTCC accepted the revised deal." (emphasis added)).]

the transaction" in which DTCC lost considerably less than the $250 million guarantee in failed trades resulting from Lehman's bankruptcy--_i.e._, $55 million.  _In re Lehman_, 445 B.R. at 201.

Although there is extrinsic evidence on both sides of this dispute--and Barclays and the Trustee can (and have) made strong arguments supporting disposition of the Clearance Box Assets to either of them--this is precisely the type of situation where the Bankruptcy Court's findings are given considerable deference, and this Court accords them so here.  _See_ _In re Kalikow_, 602 F.3d at 91.

The Bankruptcy Court reconciled the conflicting extrinsic evidence in a number of ways.  As noted, the Bankruptcy Court looked at the "commercial reality" of the situation regarding the DTCC's losses.  _In re Lehman_, 445 B.R. at 201.  It also took the Trustee's acquiescence that the Clarification Letter states unequivocally that the Clearance Box Assets are Purchased Assets to mean that the Trustee and Barclays "simply agreed in the Clarification Letter that the Clearance Box Assets belong to Barclays," and thus, as the principal document memorializing the transaction along with the APA, the Clarification Letter "necessarily delineated the assets that were being transferred

---

*This Amended Opinion & Order is being issued pursuant to the Second Circuit's Order permitting limited remand pursuant to Fed. R. App. P. 12.1, dated July 16, 2012.  The Court will also issue a consented-to judgment pursuant to that Order.

to Barclays as part of that sale." Id. at 202.[35]   The Bankruptcy

Court ultimately found that comparing the "relative stature of

the[] two documents"--the DTCC Letter as an "implementing

transitional document" to mollify the DTCC regarding potential

losses in connection with the Sale versus the Clarification

Letter as a "central document[] that define[s] the

transaction"--the Clarification Letter was a "more compelling

and comprehensive" document regarding the "universe of assets

that the SIPA Trustee agreed to transfer to Barclays." Id. at

202.   In other words, based upon its review of the extrinsic

evidence presented at trial and, when reading the agreements

together, the Bankruptcy Court found that the Clarification

Letter evidenced the parties' true intent.

The reading of the two letters as integrated documents

further supports the Bankruptcy Court's findings.   First,

despite the Clarification Letter's recognition that the DTCC

Letter exists (and is an operative agreement), section 1(d) of

the Clarification Letter only recognizes the "guarantee"

provided in the DTCC Letter--i.e., Barclays' agreement to

transfer $250 million to the DTCC; it does not recognize the

exclusion of the Clearance Box Assets (since it expressly

---

[35] That finding further supports the enforcement of the Clarification Letter's
transfer of the Margin Assets on its clear terms.

includes those assets as Purchased Assets less than two pages earlier). [R. 61, 63.]

Second, the DTCC sought the letter primarily to guarantee any potential losses; once the doomsday scenario that the DTCC envisioned--i.e., suffering considerable losses in settling LBI's trades--did not come to pass, the letter no longer was necessary. Thus, because the DTCC Letter no longer has relevance to the Sale, the Clarification Letter controls. See In re Lehman, 445 B.R. at 203.

For all of those reasons, the Court affirms the Decision of the Bankruptcy Court regarding the Clearance Box Assets.


III. CONCLUSION

For the aforementioned reasons, the Bankruptcy Court's February 22, 2011 Opinion is AFFIRMED IN PART and REVERSED IN PART. The Bankruptcy Court's holding that Barclays is not entitled to the 15c3-3 Assets is AFFIRMED; the Bankruptcy Court's finding that Barclays is entitled to the Clearance Box Assets is AFFIRMED; the Bankruptcy Court's holding that Barclays is not entitled to the Margin Assets--and the award of prejudgment interest from Barclays to the Trustee thereon--is REVERSED.

*This Amended Opinion & Order is being issued pursuant to the Second Circuit's Order permitting limited remand pursuant to Fed. R. App. P. 12.1, dated July 16, 2012. The Court will also issue a consented-to judgment pursuant to that Order.

Accordingly, Barclay's appeal is GRANTED IN PART and DENIED IN PART and the Trustee's cross-appeal is DENIED.

The Clerk of the Court is directed to close both of the actions at issue in this Opinion--11 Civ. 6052 and 11 Civ. 6053.


SO ORDERED:

Dated: June 5, 2012
Amended: July 16, 2012


_____
          KATHERINE B. FORREST
          United States District Judge