**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

LEHMAN BROTHERS INC.,

       Debtor.

---

BARCLAYS CAPITAL INC. and BARCLAYS       Case No. 11 CV 6052 (KBF)
BANK PLC,                              Case No. 11 CV 6053 (KBF)

       Appellants and Cross-Appellees,

           v.

JAMES W. GIDDENS, AS TRUSTEE FOR
THE SIPA LIQUIDATION OF LEHMAN
BROTHERS INC.,

       Appellee and Cross-Appellant.

---

### CORRECTED MEMORANDUM OF LAW IN SUPPORT OF THE TRUSTEE'S MOTION TO CONFIRM THE SCOPE OF THE COURT'S AMENDED OPINION AND ORDER AND JUDGMENT

William R. Maguire
Samuel C. McCoubrey
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
(212) 837-6000 (telephone)
(212) 422-4726 (facsimile)
bill.maguire@hugheshubbard.com

November 6, 2014

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................1

PROCEDURAL BACKGROUND.............................................................................3

FACTUAL BACKGROUND......................................................................................4

    THE SALE TO BARCLAYS ....................................................................4

    THE DISPUTE OVER THE MARGIN ASSETS ...............................................5

        The Residual Cash ..........................................................................6

        Barclays Disclaimed The Residual Cash ....................................................7

        The Affiliate Derivatives ..........................................................................8

        The Affiliate Collateral ..........................................................................9

        Barclays Claimed The Affiliate Collateral
        (But Not The Residual Cash) In The Bankruptcy Court...............................9

        The Bankruptcy Court Awarded All Of The Margin Assets To The
        Trustee...........................................................................................10

        Barclays Did Not Claim The Residual Cash Or
        The Affiliate Collateral On Appeal To This Court.................................10

        Barclays Did Not Claim The Residual Cash Or The
        Affiliate Collateral On Appeal To The Second Circuit ........................12

ARGUMENT ............................................................................................................13

I.     BARCLAYS IS NOT ENTITLED TO THE RESIDUAL CASH....................................14

    A.    Under This Court's Order, Barclays Is Not Entitled To The Residual Cash.........14

    B.    Barclays Disclaimed The Residual Cash, And
        It Is Too Late For Barclays To Reverse Its Position..............................14

    C.    The Residual Cash Was Excluded From The Sale. .............................15

II.    BARCLAYS IS NOT ENTITLED TO THE AFFILIATE COLLATERAL....................16

    A.    This Court's Order Does Not Entitle Barclays To The Affiliate Collateral. .........17

    B.    Barclays Has Waived Any Claim To The Affiliate Collateral. ............................17

## TABLE OF CONTENTS

### (Continued)

Page

1. The Bankruptcy Court awarded the Affiliate Collateral to the Trustee. .......................................................18

2. On appeal, Barclays waived its claim to the Affiliate Collateral to avoid undermining its claim to margin that was "inextricably linked" to derivatives it acquired. ..........................18

C. Barclays' Claim To The Affiliate Collateral, Like Its Claim To The Residual Cash, Lacks Merit. ..............................................19

   1. The Affiliate Derivatives and the Affiliate Collateral were not sold to Barclays............................................19

   2. The cash exclusion excludes the Affiliate Collateral from the sale...........22

   3. The exclusion of affiliate-owned assets excludes the Affiliate Collateral from the sale. ........................................22

   4. The exclusion of assets set aside to satisfy liabilities that remained with the LBI estate excludes the Affiliate Collateral from the sale. ........................................22

CONCLUSION.....................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25 (1996)...............................................20

*Hall v. EarthLink Network, Inc.*, 396 F.3d 500 (2d Cir. 2005)......................................................19

*Intellivision v. Microsoft Corp.*, 484 F. App'x 616 (2d Cir. 2012)................................................21

*In re Lehman Bros. Holdings Inc.*, 761 F.3d 303 (2d Cir. 2014)......................................13, 15, 17

*In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129 (2d Cir. 2008) ..........................................15

*Pignons S.A. de Mecanique v. Polaroid Corp.*, 701 F.2d 1 (1st Cir. 1983)...................................19

*City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*, 679 F.3d 64 (2d Cir. 2012).....15, 19

STATUTES AND RULES

Fed R. Civ. P. 30(b)(6)...............................................................................................................7, 8

James W. Giddens (the "Trustee"), as trustee for the Securities Investor Protection Act ("SIPA") liquidation of Lehman Brothers Inc. ("LBI"), respectfully submits this corrected memorandum of law in support of his motion to confirm the scope of the Court's Amended Opinion and Order (the "Order") and Judgment.

## PRELIMINARY STATEMENT

Two years ago, this Court issued an Order and a Judgment in favor of Barclays Capital Inc. ("Barclays") with respect to property, in an amount estimated to be approximately $4 billion, that secured obligations under the exchange-traded derivatives Barclays purchased from LBI in September 2008.  The Second Circuit has affirmed this Court's Judgment, and the Trustee is making arrangements to pay Barclays the portion of the property to which Barclays is entitled that is in the Trustee's possession.  Barclays, however, is taking the position that the Judgment covers not only the property that was the subject of the proceedings in this Court and the Second Circuit, but also an additional $1.3 billion.  To avoid confusion and further unnecessary proceedings in the Bankruptcy Court concerning the meaning and scope of this Court's Judgment, this motion asks the Court to confirm that its Judgment does not reach the additional $1.3 billion.

The additional $1.3 billion, by which Barclays seeks to expand its recovery, is made up of two components.  First, Barclays is claiming $595 million in "Residual Cash," consisting of LBI-owned cash and cash equivalents in accounts that did not contain any exchange-traded derivatives when the sale closed.  Because the Residual Cash did not secure any derivatives at all, let alone any derivatives that Barclays acquired, Barclays has no basis to claim this property. Barclays declined to assert any entitlement to the Residual Cash during the previous proceedings before this Court or during the subsequent appeal to the Second Circuit.  Indeed, in proceedings

in the Bankruptcy Court, Barclays admitted repeatedly that it did not have any claim to the Residual Cash.

Second, Barclays seeks approximately $710 million in "Affiliate Collateral," consisting of cash and cash equivalents that secured derivatives owned by LBI affiliates (the "Affiliate Derivatives").  Barclays did not purchase the Affiliate Derivatives in the sale.  Nor did it assume the more than $3 billion in claims filed by LBI affiliates against the LBI estate in respect of the Affiliate Derivatives and Affiliate Collateral.  Because the Affiliate Collateral secured Affiliate Derivatives that Barclays did not acquire, Barclays has no right to this cash.

Although Barclays claimed the Affiliate Collateral in the Bankruptcy Court, on appeal to this Court, Barclays dropped the claim to the Affiliate Collateral, presumably to avoid undercutting its principal argument that the parties to the sale never would have intended to separate collateral from the derivatives that it secured.  Accordingly, Barclays framed its appeal as a dispute over the "Margin Assets," that is, the "LBI proprietary assets held to secure the [exchange-traded derivatives] *that were transferred to Barclays in the Sale*."  (Opening Br. of Appellants Barclays Capital Inc. and Barclays Bank PLC ("Barclays' Dist. Ct. Br.") at 7 (emphasis added).)  This Court accepted Barclays' argument, holding that "nothing anywhere specifies that any form of derivative instrument was to be separated from its collateral."  (Order at 39 n.24.)  Because the Affiliate Collateral secured obligations under Affiliate Derivatives that *were not* transferred to Barclays (unlike the Margin Assets), the appeal as framed by Barclays and decided by this Court did not address the disposition of the Affiliate Collateral.  Likewise, on the Trustee's appeal of the Judgment to the Second Circuit, Barclays took the same position that collateral could not be separated from the derivatives it secured – an argument the Second

Circuit accepted.  Thus, in responding to the Trustee's appeal and in Barclays' cross-appeal before the Second Circuit, Barclays did not claim the Affiliate Collateral.

Barclays is not entitled to either the Residual Cash or the Affiliate Collateral under the terms of the parties' sale agreement as interpreted by both this Court and the Second Circuit. The Court does not need to reach the dubious merits of Barclays' claims to the Residual Cash and the Affiliate Collateral, however, because Barclays has waived any claim to the Residual Cash or the Affiliate Collateral.  As the appellant before this Court, Barclays defined the scope of its appeal.  By choosing to define the appeal as a dispute over collateral for the derivatives it acquired, Barclays waived any argument that it also is entitled to the Residual Cash or to collateral for derivatives that it did not acquire.  Barclays was entitled to present its strongest, most consistent argument on appeal.  Having done so and prevailed, Barclays is not entitled to supplement its take by asserting inconsistent claims that it declined to advance the first time around.

## PROCEDURAL BACKGROUND

This case concerns a dispute between the Trustee and Barclays over the disposition of the "Margin Assets," which consist of cash and cash equivalents that supported LBI's exchange-traded derivative trading, under the terms of a September 2008 bankruptcy sale.  On July 15, 2011, the Bankruptcy Court entered a judgment awarding the Margin Assets to the Trustee. Barclays appealed to this Court, and this Court issued an Order reversing the Bankruptcy Court.

In light of this Court's Order, the parties submitted to the Court an agreed form of Judgment providing that Barclays was entitled to the "Margin Assets," which the Judgment and the Order defined as "the 'property that may be held to secure obligations under' the exchange-traded derivatives transferred to Barclays in the Sale – approximately $4 billion of proprietary margin held at various financial institutions."  (Judgment ¶ 1; Order at 2 (quoting Barclays' Dist.

3

Ct. Br. at 5).)  The parties were unable to agree on the exact amount of Margin Assets to which

Barclays was entitled based on this definition, so the Judgment does not specify the amount that

the Trustee is obligated to pay to Barclays.  The Court entered the agreed Judgment on July 16,

2012, and the Trustee appealed.

On August 5, 2014, the Second Circuit  affirmed.  The Judgment entitles Barclays to

retain $2.05 billion in Margin Assets that already are in Barclays' possession.  The Trustee is

making arrangements to pay Barclays a further $1.55 billion in respect of the Margin Assets in

his possession, plus post-judgment interest, and the remaining Margin Assets are held by LBI's

European affiliate – bringing the total amount covered by the Judgment to more than $4 billion:

| | |
|---|---|
| Margin Assets Already in Barclays' Possession: | $2.05 Billion |
| Payment of Margin Assets: | $1.55 Billion |
| Margin Assets at European Affiliate:[1] | Approximately $0.44 Billion |
| Total Amount Covered by Judgment: | Approximately $4.04 Billion |

Barclays, however, asserts that the Judgment also entitles it to an additional $1.3 billion,

consisting of property that either did not secure any derivatives or that secured derivatives that

were not transferred to Barclays.  The Trustee has brought this motion to clarify and confirm that

the Judgment is limited to the approximately $4 billion in Margin Assets that secured the

derivatives Barclays acquired in the sale, and does not award Barclays the additional $1.3 billion.

## FACTUAL BACKGROUND

## THE SALE TO BARCLAYS

LBI was the U.S. broker-dealer subsidiary of Lehman Brothers Holdings Inc. ("LBHI"

and, together with LBI, "Lehman").  On September 15, 2008, LBHI filed a voluntary petition

---

1.   *See* Judgment ¶ 1(c)(iii).

under chapter 11 of the Bankruptcy Code.  (R. at 66833-34 [Bankruptcy Court Opinion].)  The filing included numerous LBHI subsidiaries, but not LBI.  On September 16, 2008, LBHI, LBI, and LB 745 LLC (another LBHI subsidiary) entered into an Asset Purchase Agreement (the "APA") under which Lehman agreed to sell the majority of LBI's assets to Barclays.  The APA defines the "Purchased Assets" broadly as all the assets of LBHI and LBI that were used in the defined "Business," with the exception of certain "Excluded Assets."  Most of these assets were owned by LBI.

On Friday afternoon, September 19, 2008, the Securities Investor Protection Corporation ("SIPC") filed a motion in this Court to commence the liquidation of LBI under SIPA.  This Court granted SIPC's motion, appointed the Trustee, and referred the liquidation to the Bankruptcy Court.  (R. at 59050-57 [Order Commencing Liquidation].)  Later that same afternoon, the Bankruptcy Court commenced a hearing (the "Sale Hearing") to consider whether to approve the sale of LBI assets to Barclays.  At the outset of the Sale Hearing, LBHI's counsel advised the Bankruptcy Court that the parties were drafting a "Clarification Letter" to reflect changes to the deal that had been negotiated since Tuesday, when the APA was signed, and to clarify certain ambiguities in the APA.  (R. at 35818 [Sale Hearing Tr. 48:8-13].)

The Sale Hearing concluded in the early morning hours of Saturday, September 20, after which the Bankruptcy Court entered an order approving the sale (the "Sale Order").  The parties spent the ensuing weekend negotiating and drafting the terms of the Clarification Letter.  (R. at 66821 [Bankruptcy Court Opinion].)  They finalized the Clarification Letter (which was backdated to September 20) and closed the sale on Monday morning, September 22, 2008.

**THE DISPUTE OVER THE MARGIN ASSETS**

In the months following the sale, a dispute over the sale terms arose between Barclays and the Trustee.  Much of the dispute revolved around Barclays' assertion that the sale terms

entitled it to the Margin Assets.[2]  On September 15, 2009, the Trustee filed a motion in the

Bankruptcy Court seeking a declaration that Barclays was not entitled to the Margin Assets.  On

November 16, 2009, the Trustee filed an adversary complaint seeking substantially the same

relief.  On January 29, 2010, Barclays filed its own motion, which sought delivery of all

undelivered assets that Barclays acquired in the sale – including "all property used to secure

obligations under any and all exchange-traded derivatives."  (R. at 60603 [Motion of Barclays

Capital Inc. to Enforce the Sale Order and Secure Delivery of All Undelivered Assets

("Barclays' Motion")].)  In support of its motion, Barclays relied upon Paragraph 1(a) of the

Clarification Letter, which defines the Purchased Assets to include (i) "all of the assets of Seller

used primarily in the Business or necessary for the operation of the Business (in each case,

excluding the Excluded Assets)"; and (ii) "exchange-traded derivatives (and any property that

may be held to secure obligations under such derivatives)."  (R. at 61-62 [Clarification Letter

¶ 1(a)].)

**The Residual Cash**

When the sale to Barclays closed on September 22, 2008, LBI held fourteen accounts

with clearing brokers that previously had been used for exchange-traded derivative trading, but

that no longer contained any derivatives.  All of the derivative positions in these accounts had

been closed out by September 19, 2008.  (McCoubrey Decl. ¶ 5.)  In addition, LBI held one

---

2. The parties also disputed whether Barclays was entitled to securities held in LBI's clearance box accounts at the
Depository Trust and Clearing Corporation and to certain assets in LBI's customer reserve accounts.  This
motion does not involve these disputes.  The Trustee is arranging to pay Barclays the agreed sum of $1.1
billion, representing the stipulated value of the securities in LBI's clearance box accounts.  The Trustee
previously paid Barclays $769 million from LBI's customer reserve accounts, after it became clear that he
would make a 100% distribution on allowed customer claims.

account at a clearing broker that had never been used for derivatives trading.[3]  (*Id.* ¶ 6.)

Approximately $595 million of Residual Cash remained in these fifteen accounts as of

September 19, 2008.  (*See id.* Ex. 1.)  $182 million was in six "house" clearing accounts that LBI

had at one point used to clear proprietary and/or affiliate trades, and $263 million was in eight

"customer" clearing accounts that LBI had at one point used to clear customer trades.  (*See id.*)

Although LBI had used the customer clearing accounts for trading on behalf of its customers, the

Residual Cash remaining in these accounts consisted of LBI's own proprietary cash.  The

remaining $150 million of Residual Cash was in the account that LBI had never used for

derivatives trading.  (*See id.*)

**Barclays Disclaimed The Residual Cash**

        None of the Residual Cash secured obligations under any exchange-traded derivatives.

As of the closing, the accounts containing the Residual Cash did not contain a single exchange-

traded derivative.  In the Bankruptcy Court, Barclays did not argue that it was entitled to the

Residual Cash.  To the contrary, Barclays repeatedly avowed that it was not claiming cash in

accounts that had no open derivative positions as of the closing:

- Prior to the closing, Barclays acknowledged to the CFTC "that the positions in the house accounts may have been liquidated by the time the transfer occurs.  As a result, it is possible that there will be no house accounts transferred."  (R. at 50415 n.1 [Sept. 19, 2008 Letter from K. Raisler to A. Radhakrishnan].)

- After the closing, Barclays advised the Trustee that "[i]n those situations where there were no open positions at the time of the transfer, BCI would not be seeking the collateral in those accounts."  (R. at 25195 [Dec. 23, 2008 Email from K. Raisler to C. Kiplok].)

---

3.   LBI had deposited $150 million with Macquarie Bank Ltd. ("Macquarie") as a good faith deposit to secure the return of Macquarie's customer funds that LBI held for Macquarie.  (McCoubrey Decl. Ex. 2 [Mar. 31, 2008 Letter Agreement between LBI and Macquarie].)  Macquarie established an LBI house account to hold this $150 million.  (*Id.*)  Given that the $150 million had nothing to do with the derivatives that LBI traded through Macquarie using separate accounts, and could never be said to secure obligations under derivatives transferred to Barclays, Barclays' claim to this portion of the Residual Cash is frivolous.

- Barclays' Rule 30(b)(6) witness on its claim to Margin Assets testified that Barclays did not claim any collateral associated with house accounts that had no open positions as of the closing.  (McCoubrey Decl. Ex. 3 [James Dep. 255:2-256:20].)

- A chart produced by Barclays at Barclays' Rule 30(b)(6) deposition, which was titled "Lehman Brothers Inc. Proprietary Futures Collateral Positions as of Acquisition 9/22/08," contained a handwritten note stating "[h]ave not claimed the collateral for accounts where no live trades @ 9/22."  (*Id.* Ex. 4.)

- Barclays' Rule 30(b)(6) witness on its acquisition accounting confirmed, with respect to accounts listed on Movants' Exhibit 750, that "[t]he ones with the N we've not claimed the collateral in those accounts because there were no live trades on the 22nd of September."  (*Id.* Ex. 5 [Romain Dep. 180:20-181:21].)

**The Affiliate Derivatives**

LBI traded exchange-traded derivatives on its own behalf and on behalf of its customers. In addition to its proprietary and customer trading, LBI also traded on behalf of its affiliates. The exchange-traded derivatives that LBI traded included both (i) options, which primarily were traded through the Options Clearing Corporation (the "OCC"), and (ii) futures, which primarily were traded through brokers and exchanges other than the OCC.  The Affiliate Derivatives consist entirely of futures that were traded through brokers and exchanges other than the OCC. Some of the Affiliate Derivatives were traded in accounts that LBI used exclusively for affiliate trading at the time of the sale, while other Affiliate Derivatives were traded in "mixed" accounts that LBI used for affiliate trading in addition to customer and/or proprietary trading.  (*Id.* ¶¶ 8-9.)

Barclays acquired LBI's exchange-traded derivatives for its own account, and it acquired customers' derivatives to hold on behalf of those customers as their new broker-dealer. Barclays, however, did not purchase any of the Affiliate Derivatives.  The Clarification Letter's

8

definition of the "Purchased Assets" expressly excludes assets of LBI's affiliates.[4]  Likewise,

Barclays did not acquire the Affiliate Derivatives as broker-dealer to hold on behalf of LBI's

affiliates, because the Clarification Letter provides for Barclays to acquire customer accounts

"other than customer[s] who are Affiliates of LBI."  (R. at 64 [Clarification Letter ¶ 8].)

**The Affiliate Collateral**

When LBI traded exchange-traded derivatives on behalf of third parties, such as

customers or affiliates, the third parties posted margin with LBI, which LBI then used to support

the derivatives trading it did on behalf of those third parties.  The Affiliate Derivatives were

secured by Affiliate Collateral, which was set aside to satisfy liabilities for those derivatives.

Barclays is now claiming a total of approximately $710 million in Affiliate Collateral:

- $185 million in accounts that, at the time of the sale, contained only Affiliate Derivatives, and no proprietary or customer derivatives.  (McCoubrey Decl. ¶ 10.)

- Approximately $315 million that LBI was required to set aside for Affiliate Derivatives in the mixed accounts.  (*Id.* ¶ 18.)

- Approximately $210 million of cash in excess of the margin requirement that was attributable to Affiliate Derivatives in the mixed accounts.  (*Id.*)

**Barclays Claimed The Affiliate Collateral**
**(But Not The Residual Cash) In The Bankruptcy Court**

Barclays argued to the Bankruptcy Court that it was entitled to all of the cash and cash

equivalents that secured any exchange-traded derivatives as of the closing – whether or not

Barclays acquired those derivatives.  Thus, Barclays sought "all property used to secure

---

4.   *See* R. at 61 [Clarification Letter ¶ 1(a)] (Purchased Assets include "none of the assets of Subsidiaries of LBHI (other than assets of LBI) except as otherwise specifically provided."); R. at 68 [Clarification Letter ¶ 23] ("Except with respect to Purchased Intellectual Property, no assets owned (in whole or in part) by any subsidiary of LBHI (other than LBI, 745 and any Subsidiaries sold pursuant to the Original Agreement or the Letter) organized under the laws of a jurisdiction other than the United States of America or a state thereof are included among the Purchased Assets.").  All of the LBI affiliates at issue here were subsidiaries of LBHI, and none were sold to Barclays under the sale agreement.

obligations under any and all exchange-traded derivatives" (R. at 60603 [Barclays' Motion]) and expressly claimed the Affiliate Collateral (*see* R. at 64973 [Barclays' Proposed Findings of Fact ¶ 31.27.7.1]).  The Trustee contested Barclays' expansive reading of the sale agreements, arguing that, at a minimum, Barclays was not entitled to "hundreds of millions of dollars in Margin Assets that LBI posted at foreign exchanges with respect to affiliates' derivatives that Barclays did not even acquire."  (R. at 61349 n.18 [Trustee's Reply].)  Barclays did not argue before the Bankruptcy Court that it was entitled to the Residual Cash – presumably because it had correctly disclaimed any right to the Residual Cash.

**The Bankruptcy Court Awarded All Of The Margin Assets To The Trustee**

On February 22, 2011, after a 34-day trial, the Bankruptcy Court issued an opinion (the "Bankruptcy Court Opinion") awarding the Margin Assets to the Trustee.  The Bankruptcy Court understood that Barclays had put the disposition of the Affiliate Collateral at issue, and so expressly included the Affiliate Collateral in its decision:  "The Margin Assets consist of LBI property used to support trading conducted by LBI on its own behalf and *on behalf of its customers and affiliates*."  (R. at 66878 [Bankruptcy Court Opinion] (emphasis added).)  On July 15, 2011, the Bankruptcy Court entered final Orders and Judgments implementing its opinion.

**Barclays Did Not Claim The Residual Cash Or**
**The Affiliate Collateral On Appeal To This Court**

Barclays appealed the Bankruptcy Court's Margin Assets decision to this Court.  In claiming that it was entitled to the Margin Assets, Barclays relied largely on the argument that, because exchange-traded derivatives and margin are "inextricably linked," "[n]o one would ever take the derivatives without the collateral."  (Barclays' Dist. Ct. Br. at 13-14 (quoting R. at 56955 [Ricci Trial Tr.]).)  In light of its reliance on the "inextricable link" between derivatives and margin, Barclays defined the "Margin Assets" that it claimed on appeal to consist only of

10

"any LBI proprietary assets held to secure the [exchange-traded derivatives] that were transferred to Barclays in the Sale." (*Id*. at 7.) Barclays explained that LBI's proprietary and customer exchange-traded derivatives had been transferred to it, and asserted that it needed the Margin Assets to secure the obligations associated with those derivatives. (*Id*. at 11 & n.4.) At no point during the appeal did Barclays challenge the Bankruptcy Court's ruling that the Trustee is entitled to the Affiliate Collateral attributable to Affiliate Derivatives that Barclays did not acquire. Nor did Barclays suggest that it was claiming Residual Cash in accounts that did not contain any derivatives.

Moreover, Barclays represented to this Court that "[t]he parties previously agreed in the record and on appeal that the value of Margin Assets in dispute on appeal is approximately $4 billion." (McCoubrey Decl. Ex. 9 [June 19, 2012 Letter from J. Schiller to Hon. K. Forrest].) The Trustee agrees that this Court's Margin Assets judgment covers an estimated $4 billion of property, all of which secured proprietary or customer exchange-traded derivatives that Barclays acquired in the sale. (*See supra* at 4.) That amount does not include any Residual Cash or any Affiliate Collateral. During the appeal to this Court, Barclays never so much as hinted that, in addition to this approximately $4 billion in cash securing the derivatives it acquired, it also claimed (or subsequently would claim) another $1.3 billion in Residual Cash (securing no derivatives) and Affiliate Collateral (securing derivatives Barclays did not acquire).

The Court ruled on the appeal as it was framed by the appellant, Barclays. In its Judgment entered on July 16, 2012 – an agreed form of Judgment that had been submitted by the parties to effectuate the Court's Order – this Court decreed that Barclays was "entitled to all of the 'Margin Assets' as defined on page 2 of the Court's Opinion (as revised)." (Judgment ¶ 1.) Page 2 of the Court's revised opinion defined the Margin Assets as "the 'property that may be

held to secure obligations under' the exchange-traded derivatives transferred to Barclays in the

Sale – approximately $4 billion of proprietary margin held at various financial institutions."

(Order at 2 (quoting Barclays' Dist. Ct. Br. at 5).)  As the Court explained, the Margin Assets

disputed on appeal "were LBI property, used by LBI to support trading on its own behalf as well

as on behalf of its customers."  (*Id.* at 8.)  In awarding Barclays these assets, the Court found that

"business sense and logic dictate exchange-traded derivatives necessarily includes collateral."

(*Id.* at 27 n.16.)  The Court further found that "nothing anywhere specifies that any form of

derivative instrument was to be separated from its collateral."  (*Id.* at 39 n.24.)

**Barclays Did Not Claim The Residual Cash Or The**
**Affiliate Collateral On Appeal To The Second Circuit**

The Trustee appealed the Court's ruling on the Margin Assets to the Second Circuit.

Barclays did not file a cross-appeal challenging this Court's ruling that it was entitled only to the

margin securing the exchange-traded derivatives transferred to it in the sale, rather than the

margin securing "any and all exchange-traded derivatives" (as Barclays had framed the issue in

the Bankruptcy Court).  Rather, in its Second Circuit brief, Barclays continued to define the

Margin Assets that were in dispute as "the LBI property held to secure the exchange-traded

derivatives LBI transferred to Barclays in the sale" and continued to argue that "no one would

have acquired the exchange-traded derivatives without acquiring the margin."  (Final Form Br.

for Appellees-Cross-Appellants ("Barclays' Second Circuit Br.") at 1, *In re Lehman Bros.*

*Holdings Inc.*, No. 12-2322, ECF No. 219 (2d Cir. Apr. 16, 2013); McCoubrey Decl. Ex. 10

[Second Circuit Oral Argument Tr. 17:3-5].)  Barclays did not raise any issue concerning the

Affiliate Collateral or the Residual Cash before the Second Circuit, either in its briefing or at oral

argument.  Because the Judgment of this Court from which the Trustee appealed did not award

the Residual Cash or the Affiliate Collateral to Barclays and because Barclays did not raise the

issue on appeal, the Trustee had no occasion to address those assets before the Second Circuit.

The Second Circuit affirmed the Judgment with respect to the Margin Assets, noting that

"[t]he assets in dispute were LBI property and pledged by LBI to support its own and customer

trading." *In re Lehman Bros. Holdings Inc.*, 761 F.3d 303, 309 (2d Cir. 2014). The Second

Circuit agreed with Barclays that "any interpretation [of the parties' contract] that would . . .

result in the sale of the exchange-traded derivatives without the Margin Assets as collateral is

rendered implausible by the commercial unlikelihood of such a deal in the circumstances

described." *Id.* at 312.

## ARGUMENT

Based on its argument that it must be awarded the margin securing derivatives it acquired

in the sale because of the "inextricable link" between margin and the derivatives it secures,

Barclays sought and was awarded a Judgment covering approximately $4 billion in "Margin

Assets," as Barclays had defined that term in the appeals. Now, however, Barclays seeks to re-

open the Margin Assets litigation to claim another $1.3 billion in Residual Cash and Affiliate

Collateral that it did not claim during the appeals and that did not secure the derivatives it

acquired (and in fact secured no derivatives at all or derivatives that Barclays expressly left

behind). Barclays' current position on the Residual Cash conflicts with Barclays' prior

admissions that it is not entitled to that cash. Barclays' current position on the Affiliate

Collateral cannot be reconciled with Barclays' position during the appeals. If, as Barclays

successfully argued, it is commercially implausible that derivatives would be separated from

their collateral, then Barclays' own logic (and this Court's and the Second Circuit's logic) dictate

that the Affiliate Collateral should stay with the Affiliate Derivatives it secured.

13

Because Barclays declined to risk its credibility on appeal by claiming the Residual Cash or the Affiliate Collateral, neither this Court nor the Second Circuit addressed those assets.  That does not leave their disposition an open issue, however.  The doctrine of waiver bars Barclays from now asserting claims that it declined to make during its appeal.  And even were this Court to reach the merits of Barclays' post-appeal claims, the APA and Clarification Letter, as interpreted by this Court and the Second Circuit, unambiguously exclude the Residual Cash and the Affiliate Collateral from the sale.

## I.   BARCLAYS IS NOT ENTITLED TO THE RESIDUAL CASH.

### A.   Under This Court's Order, Barclays Is Not Entitled To The Residual Cash.

In its Order, this Court awarded Barclays "the 'property that may be held to secure obligations under' the exchange-traded derivatives transferred to Barclays in the Sale."  (Order at 2 (quoting Barclays' Dist. Ct. Br. at 5).)  The Residual Cash does not secure any obligations under any exchange-traded derivatives, much less "'obligations under' the exchange-traded derivatives transferred to Barclays," because all of the Residual Cash was in accounts that did not contain any exchange-traded derivatives when the sale closed.  Accordingly, the Order does not entitle Barclays to the Residual Cash.

### B.   Barclays Disclaimed The Residual Cash, And It Is Too Late For Barclays To Reverse Its Position.

Barclays has never before claimed cash that was *not* held to secure exchange-traded derivatives.  In the Bankruptcy Court, Barclays claimed "all property used to secure obligations under any and all exchange-traded derivatives."  (R. at 60603 [Barclays' Motion].)  On appeal, Barclays narrowed its claim to "any LBI proprietary assets held to secure the [exchange-traded derivatives] that were transferred to Barclays in the Sale."  (Barclays' Dist. Ct. Br. at 7; *see*

Barclays' Second Circuit Br. at 1.)  Neither of these descriptions of the disputed margin include the Residual Cash.

In fact, Barclays has repeatedly and affirmatively disclaimed the Residual Cash. Barclays' lawyer unequivocally stated that "[i]n those situations where there were no open positions at the time of the transfer, BCI would not be seeking the collateral in those accounts." (R. at 25195 [Dec. 23, 2008 Email from K. Raisler to C. Kiplok]; *see also supra* at 7-8 (Barclays admitted at least five times that it did not acquire Residual Cash).)  Barclays did not change its tune in the Bankruptcy Court proceedings, during the appeal to this Court, or before the Second Circuit.  It is too late for Barclays to do so now.  *See In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 132-33 (2d Cir. 2008) (refusing to consider argument that was not raised before the trial court); *City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 66 n.2 (2d Cir. 2012) (appellants waived claims that were not addressed in their appellate brief).

## C.     The Residual Cash Was Excluded From The Sale.

Barclays' admissions that it is not entitled to the Residual Cash made sense.  Its attempt to reverse course does not.  The Residual Cash consists of cash and cash equivalents in accounts that contained no exchange-traded derivatives, and the Clarification Letter excludes from the sale "any cash, cash equivalents, bank deposits or similar cash items."  (R. at 62 [Clarification Letter ¶ 1(c)].)

The Court held that this exclusion does not apply to the Margin Assets because there is an exception for cash that is "otherwise specified" as a Purchased Asset, and Paragraph 1(a)(ii)(C) of the Clarification Letter "otherwise specified" that "any property that may be held to secure obligations under such [exchange-traded] derivatives" is a Purchased Asset.  (Order at 31.)  *See also Lehman Bros.*, 761 F.3d at 311 (relying on exception to cash exclusion for assets that are defined as "Purchased Assets").  But Paragraph 1(a)(ii)(C) does not apply to the Residual Cash

because that cash was in accounts that contained no derivatives, and so was not held to secure obligations under exchange-traded (or any other) derivatives, at the time of the sale.

The general definition of "Purchased Assets" – *i.e.*, "all of the assets of Seller used primarily in the Business or necessary for the operation of the Business" – likewise does not "otherwise specify" that the Residual Cash is a Purchased Asset.  (R. at 61 [Clarification Letter ¶ 1(a)].)  The Residual Cash was sitting alone in accounts in which all of the derivatives had been liquidated.  It no longer secured any exchange-traded derivatives, supported any ongoing derivatives-trading activities, or was used in or necessary to the operation of the Business.  It was simply "free cash" (to borrow Barclays' terminology), which Barclays has admitted many times was excluded from the sale.  (*See*, *e.g.*, Barclays' Dist. Ct. Br. at 42.)  In any event, Barclays cannot rely on the general "Purchased Assets" definition because that definition comes with an express exception:  it "exclud[es] the Excluded Assets."  (R. at 61 [Clarification Letter ¶ 1(a)].)  Since cash is an Excluded Asset, the Residual Cash would not be a Purchased Asset even if it were "used primarily in" or "necessary for the operation of" the Business.

## II.     BARCLAYS IS NOT ENTITLED TO THE AFFILIATE COLLATERAL.

In arguing on appeal that it was entitled to the Margin Assets securing the customer- and LBI-owned derivatives it acquired in the sale, Barclays asserted that exchange-traded derivatives and margin are "inextricably linked" and that "[n]o one would ever take the derivatives without the collateral."  (Barclays' Dist. Ct. Br. at 13-14 (quoting R. at 56955 [Ricci Trial Tr.]).)  This Court (and the Second Circuit) agreed with Barclays that derivatives and the associated margin are inseparable, finding that "business sense and logic dictate exchange-traded derivatives necessarily includes collateral" and that "nothing anywhere specifies that any form of derivative instrument was to be separated from its collateral."  (Order at 27 n.16, 39 n.24.)

Now, Barclays seeks to contravene its own theory of the case and this Court's findings. Applying Barclays' theory of the case, "no one" would take the Affiliate Derivatives without the Affiliate Collateral – but Barclays argues that the Trustee should be forced to do just that. Neither Barclays' own reasoning nor this Court's Order permits such a result.

### A.   This Court's Order Does Not Entitle Barclays To The Affiliate Collateral.

In its Order, the Court awarded Barclays "the 'property that may be held to secure obligations under' the exchange-traded derivatives transferred to Barclays in the Sale." (Order at 2 (quoting Barclays' Dist. Ct. Br. at 5).)  LBI's proprietary and customer exchange-traded derivatives were transferred to Barclays, and so both this Court and the Second Circuit found that the Margin Assets disputed on appeal were the LBI property "used by LBI to support trading on its own behalf as well as on behalf of its customers." (Order at 8.)  *See Lehman Bros.*, 761 F.3d at 309.  The Affiliate Collateral, however, secured obligations under derivatives – the Affiliate Derivatives – that *were not* transferred to Barclays in the sale. (*See infra* at 19-22.)  Thus, this Court's Order does not entitle Barclays to the Affiliate Collateral that secured obligations under those derivatives.

### B.   Barclays Has Waived Any Claim To The Affiliate Collateral.

After the Bankruptcy Court rejected all of Barclays' claims to Affiliate Collateral and other margin, Barclays argued on appeal to this Court that it should be awarded the Margin Assets because those assets were "inextricably linked" to the exchange-traded derivatives that it acquired. (Barclays' Dist. Ct. Br. at 13.)  Consistent with this position, Barclays defined the "Margin Assets" that it claimed on appeal as "any LBI proprietary assets held to secure the [exchange-traded derivatives] that were transferred to Barclays in the Sale." (*Id.* at 7.)  In this Court, Barclays did not claim, was not awarded, and, under its own theory of the case, is not

entitled to LBI cash held to secure exchange-traded derivatives that *were not* transferred to Barclays in the sale.  Thus, Barclays has waived any claim to the Affiliate Collateral.

### 1. The Bankruptcy Court awarded <br> the Affiliate Collateral to the Trustee.

Before the Bankruptcy Court, Barclays claimed "all property used to secure obligations under any and all exchange-traded derivatives," a claim that put the Affiliate Collateral squarely at issue.  (R. at 60603 [Barclays' Motion]; *see* R. at 64973 [Barclays' Proposed Findings of Fact ¶ 31.27.7.1].)  In response, the Trustee disputed Barclays' entitlement to the Affiliate Collateral.  (R. at 61349 n.18 [Trustee's Reply].)  The Bankruptcy Court found in favor of the Trustee and specifically awarded him the Affiliate Collateral – *i.e.*, the "LBI property used to support trading conducted by LBI . . . on behalf of its . . . affiliates."  (R. at 66878 [Bankruptcy Court Opinion].)

### 2. On appeal, Barclays waived its claim to the Affiliate <br> Collateral to avoid undermining its claim to margin <br> that was "inextricably linked" to derivatives it acquired.

Although Barclays appealed the Bankruptcy Court's Margin Assets ruling, Barclays did not argue that it was entitled to the Affiliate Collateral – or, for that matter, discuss either the Affiliate Derivatives or the Affiliate Collateral at all – in its appellate briefing or during the appellate arguments before this Court and the Second Circuit.  The reason is clear:  Barclays made a strategic decision to focus on the argument that it should be awarded the Margin Assets because those assets were "inextricably linked" to the exchange-traded derivatives that it acquired in the sale, and "[n]o one would ever take the derivatives without the collateral." (Barclays' Dist. Ct. Br. at 13-14 (quoting R. at 56955 [Ricci Trial Tr.]); *see also id.* at 15, 24.)  It would have been fundamentally inconsistent with this position for Barclays to have asserted that the Affiliate Collateral, which secured Affiliate Derivatives that Barclays did *not* acquire, should be severed from the Affiliate Derivatives and awarded to Barclays – especially since the Trustee

faced billions of dollars in potential liabilities arising out of the Affiliate Derivatives.

Accordingly, Barclays defined the Margin Assets that it claimed on appeal as "any LBI

proprietary assets held to secure the [exchange-traded derivatives] that were transferred to

Barclays in the Sale." (*Id.* at 7; *see* Barclays' Second Circuit Br. at 1.)

      Barclays' litigation strategy succeeded, as this Court and the Second Circuit ruled in

favor of Barclays with respect to "the 'property that may be held to secure obligations under' the

exchange-traded derivatives transferred to Barclays in the Sale." (Order at 2 (quoting Barclays'

Dist. Ct. Br. at 5).) But this strategy came with a price – having failed to argue on appeal that the

Bankruptcy Court erred in awarding the Trustee the Affiliate Collateral (which secured Affiliate

Derivatives that were not transferred to Barclays), Barclays waived any challenge to that ruling

and any right to assert a claim to the Affiliate Collateral. *See City of Omaha*, 679 F.3d at 66 n.2;

*Hall v. EarthLink Network, Inc.*, 396 F.3d 500, 507 (2d Cir. 2005) (appellant waived claim for

actual damages where appellate brief only addressed claim for consequential damages); *Pignons

S.A. de Mecanique v. Polaroid Corp.*, 701 F.2d 1, 3 (1st Cir. 1983) ("an appellee is entitled to

rely on the content of an appellant's brief for the scope of the issues appealed").

     **C.**    **Barclays' Claim To The Affiliate Collateral,**
               **<u>Like Its Claim To The Residual Cash, Lacks Merit.</u>**

      Even if the claim were not precluded by the doctrine of waiver, Barclays would not be

entitled to the Affiliate Collateral. The Affiliate Collateral was not a Purchased Asset, and three

separate exclusions exclude the Affiliate Collateral from the sale.

     **1.**    **The Affiliate Derivatives and the**
               **<u>Affiliate Collateral were not sold to Barclays.</u>**

      LBI and its affiliates were all subsidiaries of LBHI. The Affiliate Derivatives were

owned by LBHI subsidiaries other than LBI or LB 745. The Affiliate Derivatives thus were not

owned by the "Sellers" under the APA and Clarification Letter (LBI, LBHI, and LB 745).

Because the Affiliate Derivatives were not the Sellers' assets to sell, they could not have been

Purchased Assets.  Accordingly, the Clarification Letter provides that "[t]he Purchased Assets

means . . . (ii) none of the assets of Subsidiaries of LBHI (other than assets of LBI) except as

specifically provided in the [APA] or this Letter."  (R. at 61 [Clarification Letter ¶ 1(a)].)

Because nothing in either the APA or the Clarification Letter "specifically provide[s]" that

Affiliate Derivatives are Purchased Assets, this provision excludes affiliate-owned derivatives

from the sale.[5]

Moreover, in a paragraph titled "*No Overseas Assets*," the Clarification Letter states that

"[e]xcept with respect to Purchased Intellectual Property, no assets owned (in whole or in part)

by any Subsidiary of LBHI . . . organized under the laws of a jurisdiction other than the United

States of America or a state thereof are included among the Purchased Assets."  (R. at 68

[Clarification Letter ¶ 23].)  This unambiguous language confirms that the Affiliate Derivatives –

many of which were owned by foreign subsidiaries of LBHI – were not included in the sale.[6]

Nor were the Affiliate Derivatives transferred to Barclays to hold on behalf of LBI's

affiliates.  Paragraph 8 of the Clarification Letter provides that "[a]ll customer accounts of LBI

(*other than customer[s] who are Affiliates of LBI*) shall be transferred to [Barclays]."  (R. at 64

[Clarification Letter ¶ 8] (emphasis added).)

Like all derivatives, the Affiliate Derivatives were secured by collateral.  The cash in

LBI's affiliate-only accounts necessarily secured only the Affiliate Derivatives, since the

---

5.  Paragraph 1(a)(ii)(C) of the Clarification Letter defines the Purchased Assets to include "exchange-traded derivatives," but this provision does not specifically refer to Affiliate Derivatives and, therefore, must be read to refer to LBI's exchange-traded derivatives – consistent with the exclusion of affiliate assets.  *See Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 38 (1996) ("specifically" means explicitly, particularly, or definitely, and stands in contrast to "an *implicit* reference made by more general language to a broader topic").

6.  Among the affiliates that owned the Affiliate Derivatives were LBHI subsidiaries organized under the laws of the United Kingdom, Hong Kong, and the Cayman Islands.  (*See infra* at 24.)

20

affiliate-only accounts contained only Affiliate Derivatives.  (*See supra* at 8-9.)  LBI's mixed

accounts, which contained customer and/or proprietary derivatives in addition to Affiliate

Derivatives, also necessarily contained cash to secure the Affiliate Derivatives.  The cash that

LBI was required to set aside in the mixed accounts to secure the Affiliate Derivatives can hardly

be said not to have secured obligations under those derivatives.  (*See supra* at 9.)  Similarly, to

the extent that excess cash in the mixed accounts – *i.e.*, cash above the amount required to be

posted as collateral – secured anything, it must be allocated among the Affiliate Derivatives,

LBI-owned proprietary derivatives, and customer derivatives.  It would make no sense to

arbitrarily claim that all of this cash secured customer or proprietary derivatives, thereby

ignoring the existence of the Affiliate Derivatives.  As Barclays argued before this Court, "courts

should avoid interpretations that are 'commercially absurd' and make 'no economic sense.'"

(Barclays' Dist. Ct. Br. at 56.)

Given Barclays' position that "[n]o one would ever take the derivatives without the

collateral" (*Id*. at 13-14 (quoting R. at 56955 [Ricci Trial Tr.])) and the Court's finding that

"nothing anywhere specifies that any form of derivative instrument was to be separated from its

collateral" (Order at 39 n.24), the Affiliate Collateral necessarily stayed with the Affiliate

Derivatives that it secured – that is, it stayed with the Trustee, who needs the Affiliate Collateral

to satisfy liabilities associated with those derivatives (*see infra* at 24).  Indeed, the doctrine of

judicial estoppel precludes Barclays from contradicting its position on appeal (which was

adopted by this Court and the Second Circuit to rule in Barclays' favor) by now arguing that the

Affiliate Collateral should be separated from the Affiliate Derivatives and given to Barclays,

thereby leaving the Trustee with none of the collateral that secured the derivatives that remained

with the LBI estate.  *See Intellivision v. Microsoft Corp.*, 484 F. App'x 616, 622 (2d Cir. 2012)

(judicial estoppel precluded plaintiffs "from asserting a new, inconsistent position as to the ownership of property").

>        2.        **The cash exclusion excludes the Affiliate Collateral from the sale.**

The Affiliate Collateral consists of cash and cash equivalents and is, therefore, excluded from the sale by the cash exclusion in Paragraph 1(c) of the Clarification Letter.  (*See* R. at 62 [Clarification Letter ¶ 1(c)].)  The exception to the cash exclusion for assets that are "otherwise specified" as Purchased Assets does not apply because the Affiliate Collateral was not "held to secure obligations under" exchange-traded derivatives that were transferred to Barclays.  Instead, the Affiliate Collateral was held to secure obligations under Affiliate Derivatives that *were not* transferred to Barclays.

>        3.        **The exclusion of affiliate-owned assets**
>                    **excludes the Affiliate Collateral from the sale.**

Just as customers posted customer-owned margin with LBI to support the exchange-traded derivatives that LBI held on behalf of those customers, LBI's affiliates also posted their own margin with LBI to support the exchange-traded derivatives that LBI held on their behalf. (*See*, *e.g.*, McCoubrey Decl. Exs. 6-8 [Sept. 19, 2008 emails regarding margin affiliates posted with LBI].)  And Barclays did not purchase margin owned by LBI's affiliates.  The Clarification Letter makes this clear by expressly carving any assets owned by LBHI subsidiaries other than LBI (*i.e.*, assets owned by LBI's affiliates) out of the Purchased Assets.  (R. at 61, 68 [Clarification Letter ¶¶ 1(a), 23]; *see supra* at 8-9, 19-20.)

>        4.        **The exclusion of assets set aside to satisfy**
>                    **liabilities that remained with the LBI estate**
>                    **excludes the Affiliate Collateral from the sale.**

Section 1.1 of the APA excludes from the sale "any assets set aside, segregated, or otherwise specifically identified as being held for the purpose of satisfying Excluded Liabilities

referred to in Section 2.4(e)."  (R. at 8 [APA § 1.1].)  Section 2.4(e) excludes "all Liabilities

relating to amounts required to be paid by Seller, hereunder, including upon any breach."  (R. at

16 [APA § 2.4(e)].)  Section 1.1, therefore, excludes "any assets set aside, segregated, or

otherwise specifically identified as being held for the purpose of satisfying" any "Liabilities

relating to amounts required to be paid by Seller" under the APA.  In other words, Section 1.1

excludes assets set aside to satisfy liabilities for which the LBI estate remained responsible under

the sale agreements.  The Affiliate Collateral was set aside to satisfy liabilities arising out of the

Affiliate Derivatives, for which LBI remained responsible under the sale agreements.

Section 2.4(a) of the APA makes this clear:  it excludes from the sale "all Liabilities

arising out of Excluded Assets."  (R. at 16 [APA § 2.4(a)].)  Because the Affiliate Derivatives

were Excluded Assets (*see supra* at 8-9), Section 2.4(a) leaves with the LBI estate "all liabilities"

arising out of the Affiliate Derivatives.  Necessarily, the Affiliate Collateral set aside to satisfy

those liabilities was likewise excluded from the sale under APA Sections 1.1 and 2.4(e).[7]

Indeed, Barclays has affirmatively disclaimed liabilities arising out of the Affiliate

Derivatives.  In a stipulation concerning the effect of a settlement between LBI and Lehman

Brothers Securities Asia Ltd. ("LBSAL"), Barclays asserted that it "did not assume responsibility

for" a balance owed to LBI's clearing broker, LBSAL, in respect of an LBSAL account that

contained only Affiliate Derivatives as of the closing.  (McCoubrey Decl. Ex. 11 at 2 [Stipulation

between Trustee and Barclays].)  Barclays' decision to disclaim this liability arising out of the

---

7.  Barclays did assume liabilities arising out of affiliate-owned options that were traded at the OCC (and acquired
    the margin posted to secure those options), but under a separate agreement, the Transfer and Assumption
    Agreement (the "TAA"), which was separately negotiated with the OCC.  (*See* R. at 52 [TAA ¶ 1(b)] (Barclays
    "assume[d] and agree[d] to perform each obligation arising out of or to be performed with respect to activity in"
    LBI's accounts, with no exception in respect of affiliate-owned options).)  Barclays did not execute a similar
    agreement with any of the clearing brokers where the Affiliate Derivatives and Affiliate Collateral were held.

Affiliate Derivatives confirms that Barclays has no claim to the Affiliate Collateral set aside to satisfy such liabilities.

Moreover, by stripping the LBI estate of the Affiliate Collateral that secured obligations under the Affiliate Derivatives, Barclays would leave the Trustee with no margin to use in accounting to LBI's affiliates for the derivatives and margin that LBI held on their behalf.  LBI's affiliates filed claims against the LBI estate seeking to recover more than $3 billion for their Affiliate Derivatives and Affiliate Collateral, including:

- Over $2.4 billion in exchange-traded derivative claims filed by Lehman Brothers Commodity Services Inc. ("LBCS") (*Id.* Ex. 20 [Claim filed by LBCS]);

- Over $400 million in exchange-traded derivative claims filed by LBI's U.K. affiliate (*id.* Ex. 21 [Trustee's Motion to Approve Settlement with LBIE ¶ 41]);

- Over $100 million in exchange-traded derivative claims filed by LBI's Hong Kong affiliates (*id.* Exs. 12-16 [Claims filed by Lehman Brothers Asia Capital Company and Lehman Brothers Commercial Corporation Asia Ltd.);

- Over $90 million in exchange-traded derivative claims filed by LBI's Cayman Islands affiliate (*id.* Ex. 26 [Claim filed by LB India Holdings Cayman II]); and

- Over $60 million in exchange-traded derivative claims filed by Lehman Brothers Special Financing Inc. ("LBSF") (*id.* Ex. 27 [Claim filed by LBSF]).[8]

It is undisputed that the Trustee – not Barclays – is responsible for accounting to these affiliates for their assets.  The Trustee has settled the affiliates' claims, providing them with allowed claims that entitle them to distributions from the LBI estate.[9]  Barclays cannot take the Affiliate

---

8.  *See also* McCoubrey Decl. Exs. 17 [Trustee's Motion to Approve Settlement with Singapore Entities ¶ 14], 23 [Trustee's Motion to Approve Settlement with LBF ¶ 13], 24 [Claim filed by Lehman Brothers OTC Derivatives Inc.], 25 [Claim filed by Lehman Brothers Commercial Corp.], 28 [Claim filed by Lehman Brothers UK Holdings Limited].

9.  The affiliates with claims related to the Affiliate Derivatives have been granted allowed claims that total more than $6 billion to settle both their claims that are related to Affiliate Derivatives and Affiliate Collateral and their claims that are unrelated to derivatives trading.  (*See* McCoubrey Decl. Exs. 18 [Order Approving Settlement with Singapore Entities], 19 [Trustee's Motion to Approve Settlement with LBHI Entities ¶ 58, Settlement Agreement sch. I], 21 [Trustee's Motion to Approve Settlement with LBIE ¶ 72], 22 [Settlement

Collateral for its own account while leaving the Trustee to satisfy those affiliates' claims to their derivatives and margin out of other assets required to pay other creditor claims.

## **CONCLUSION**

For the foregoing reasons, the Trustee respectfully requests that the Court confirm that Barclays is not entitled to the Residual Cash or the Affiliate Collateral under the Court's Order or the Court's Judgment.

Dated:   New York, New York
         November 6, 2014

HUGHES HUBBARD & REED LLP

By:   /s/ William R. Maguire
         William R. Maguire

Samuel C. McCoubrey
One Battery Park Plaza
New York, New York 10004
(212) 837-6000 (telephone)
(212) 422-4726 (facsimile)
bill.maguire@hugheshubbard.com

*Attorneys for James W. Giddens,*
*as Trustee for the Securities Investor*
*Protection Act Liquidation of Lehman*
*Brothers Inc.*

---

Agreement between Trustee and Hong Kong Entities sch. D], 23 [Trustee's Motion to Approve Settlement with LBF ¶ 19].)